UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
NO. _3:12-cv-00850-R_

Derby Capital, LLC
and
Derby Capital JOB, LLC
2409 Greten Lane
Louisville, Jefferson County, Kentucky 40223                    **PLAINTIFFS**

VERIFIED COMPLAINT
ALLEGING
BREACH OF WRITTEN CONTRACT
OR ALTERNATIVELY – RECISSION
and
UNJUST ENRICHMENT
v.                              and
PUNITIVE DAMAGES FOR FRAUD IN THE INDUCEMENT
PROMISSORY ESTOPPEL
EQUITABLE ESTOPPEL
MULTIPLE VIOLATIONS OF 18 USC §1341, et seq. (Civil RICO)
and
MULTIPLE VIOLATIONS OF 17 C.F.R. §240.10(b)(5)
Via Private Right of Action

Trinity HR Services, LLC, a Delaware Limited Liability Company
11921 Brinley Ave.
Louisville, Jefferson County, Kentucky 40243

      Serve: The Company Corporation
             2711 Centerville Road, Suite 400
             Wilmington, Delaware 19808

Trinity HR, LLC, a Kentucky Limited Liability Company
11921 Brinley Ave., Suite 201
Louisville, Jefferson County, Kentucky 40243

      Serve: Tiffany Simmons
             11405 Vista Club Court
             Louisville, Jefferson County, Kentucky 40291
      or
             Tiffany Simmons
             11921 Brinley Ave., Suite 201
             Louisville, Jefferson County, Kentucky 40243

**Brandon Simmons, individual**
**11405 Vista Club Court**
**Louisville, Jefferson County, Kentucky 40291**

>    **Serve: Brandon Simmons**
>    **11405 Vista Club Court**
>    **Louisville, Jefferson County, Kentucky 40291**
>    **or**
>    **Brandon Simmons**
>    **11921 Brinley Ave., Suite 201**
>    **Louisville, Jefferson County, Kentucky 40243**

**Tiffany Simmons, individual**
**11405 Vista Club Court**
**Louisville, Kentucky 40291**

>    **Serve: Tiffany Simmons**
>    **11405 Vista Club Court**
>    **Louisville, Jefferson County,Kentucky 40291**
>    **or**
>    **11921 Brinley Ave., Suite 201**
>    **Louisville, Jefferson County, Kentucky 40243**

**Judson Bayard Wagenseller, individual**
**11921 Brinley Ave, Suite 201 (See: Footnote 1)**
**Louisville, Jefferson County, Kentucky 40243**

>    **Serve: Judson Bayard Wagenseller**
>    **2107 Bainbridge Row Drive**
>    **Louisville, Jefferson County, Kentucky 40207**
>    **or**
>    **11921 Brinley Ave., Suite 201**
>    **Louisville, Jefferson County, Kentucky 40243**

**LEED HR, LLC, a Kentucky Limited Liability Company**
**2650 Eastpoint Parkway, Suite 280**
**Louisville, Jefferson County, Kentucky 40223**

>    **Serve: Michael Schroering**
>    **2650 Eastpoint Parkway, Suite 280**
>    **Louisville, Kentucky 40223**

**Michael K. Schroering, individual**
**2204 Whisperwood Drive**
**Prospect, Jefferson County, Kentucky 40059-9090**

2

Serve: Michael Schroering
        2650 Eastpoint Parkway, Suite 280
        Louisville, Jefferson County, Kentucky 40223
or
        2204 Whisperwood Drive
        Prospect, Jefferson County, Kentucky 40059-9090

General Employment Enterprises, Inc.
One Tower Lane, Suite 2200
Oakbrook Terrace, Illinois 60181

        Serve: Illinois Corporation
               Service C
               801 Adlai Stevenson Drive
               Springfield, Illinois 62703

Securities & Exchange Commission
100 F. Street N.E.
Washington D.C. 20549

        Serve: Securities & Exchange Commission
               100 F. Street N.E.
               Washington D.C. 20549
               Att'n. Secretary's Office               **DEFENDANTS**

* * * * * * *

Come the Plaintiffs, Derby Capital, LLC ("Derby Capital") and Derby Capital JOB, LLC ("Derby JOB")(collectively, "the Plaintiffs"), by and through their counsel, and for their Verified Complaint state as follows:

## PARTIES

1.    Derby Capital is a Kentucky limited liability company, organized and existing under and by virtue of the laws of the Commonwealth of Kentucky on October 14, 2011, with its principal place of business being 2409 Greten Lane, Louisville, Kentucky 40223.

2.      Derby JOB is a Kentucky limited liability company, organized and existing under and by virtue of the laws of the Commonwealth of Kentucky on December 8, 2011, with its principal place of business being 2409 Greten Lane, Louisville, Kentucky 40223.

a.      Derby JOB is a wholly-owned subsidiary of Derby Capital; and, in that capacity, has entered into various contracts that are involved in this litigation.

3.      Trinity HR Services, LLC ("Trinity/Delaware") is a Delaware limited liability company, organized and existing under and by virtue of the laws of the State of Delaware on July 22, 2011, with its principal place of business (at the time of all events involved in this Verified Complaint) being 11921 Brinley Ave., Suite 201, Louisville, Kentucky 40291.

4.      Trinity HR, LLC ("Trinity/Kentucky") is a Kentucky limited liability company, organized and existing under and by virtue of the laws of the Commonwealth of Kentucky on February 9, 2011, with its principal place of business (at the time of all events involved in this Verified Complaint) being 11921 Brinley Ave., Suite 201, Louisville, Kentucky 40291.

5.      Brandon Simmons ("Mr. Simmons") is an individual adult resident of the Commonwealth of Kentucky, believed to be presently residing at 11405 Vista Club Court Louisville, Kentucky 40291.  Mr. Simmons is the husband of the Defendant, Tiffany Simmons, and is the co-manager of Trinity/Delaware and Trinity/Kentucky.  Further, Mr. Simmons has been counseled and directed in the transactions involved in this Verified Complaint by the Defendant Judson Wagonseller and (at the time of all events involved in this Verified Complaint) maintained an office in the same building also used by the Defendant Mr. Wagonseller. (See: ¶7, below)

        a.       Additionally, Mr. Simmons and Mr. Wagonseller have offices in the suite of offices located at 11921 Brinley Ave., Suite 201, Louisville, Kentucky 40291 with Mr. Wilbur Anthony Huff ("Mr. Huff")(See ¶7, below).

6.      Tiffany Simmons ("Mrs. Simmons") is an individual adult resident of the Commonwealth of Kentucky, believed to be presently residing at 11405 Vista Club Court Louisville, Kentucky 40291. Mrs. Simmons is the wife of the Defendant Mr. Simmons and serves along with Mr. Simmons as the co-manager of Trinity/Kentucky. Further, Mrs. Simmons has been counseled and directed in the transactions involved in this Verified Complaint by the Defendant Judson Wagonseller and by her father, Mr. Huff.

7.      Judson Wagenseller ("Mr. Wagenseller") is an individual, adult resident of the Commonwealth of Kentucky, believed to be presently residing and practicing law at 2107 Bainbridge Row Drive Louisville, Kentucky 40291. Mr. Wagenseller is an attorney licensed to practice law in the Commonwealth of Kentucky who at all times relative to this Verified Complaint maintained offices at 11921 Brinley Ave. Suite 201, Louisville, Kentucky 40243.

        a.       However, according to the Kentucky Bar Association's Lawyer Locater, for unknown reasons Mr. Wagenseller changed his business address to his above-noted residence on October 8, 2012.

        b.       At all times relevant to the facts before this Court, Mr. Wagenseller provided legal services to the Defendants Trinity/Delaware, Trinity/Kentucky, Mr. and Mrs. Simmons, Mr. Schroering and LEED, involving the numerous transactions that are the subject of this Verified Complaint.

        c.       Further, Mr. Wagenseller drafted documents that have been used by the Plaintiffs and Trinity/Delaware to formalize their commitments that created the contractual

relationship between the said parties; and, subsequently drafted documents that have been used by Trinity/Delaware, Trinity/Kentucky, Mr. and Mrs. Simmons, LEED and Mr. Schroering to breach the previous documents that he drafted that involved the Plaintiffs' interests in Trinity/Delaware.

   d. Further, Mr. Wagenseller has drafted every document that he has caused to be filed on the EDGAR filing system of the Securities and Exchange Commission ("SEC") involving the transactions of Trinity/Delaware, Trinity/Kentucky, Mr. and Mrs. Simmons, LEED and Mr. Schroering concerning the publicly traded securities of General Employment Enterprises, Inc. ("GEE"). These documents concern the majority share ownership of GEE involving the Plaintiffs and Trinity/Delaware, Trinity/Kentucky and Mr. Simmons beginning in December of 2011 through May of 2012.

   e. Furthermore, Mr. Wagonseller has drafted every document that he has caused to be filed on the EDGAR filing system of the SEC involving the publicly traded securities of GEE that involve the transactions of Trinity/Delaware, Trinity/Kentucky, Mr. Simmons, LEED and Mr. Schroering that occurred from mid-August of 2012 through and including the present – which are manifestly incorrect and deceptive as is described, hereinafter, and have resulted in the theft of the majority control of GEE, a publicly traded company.

   8. LEED HR, LLC ("LEED") is a Kentucky limited liability company, organized and existing under and by virtue of the laws of the Commonwealth of Kentucky on June 6, 2012, with its principal place of business being 2650 Eastpoint Parkway, Suite 280, Louisville, Kentucky 40223.

   9. Michael K. Schroering ("Mr. Schroering") is an individual, adult resident of the Commonwealth of Kentucky, believed to be presently residing at 2204 Whisperwood Drive,

Prospect, Kentucky 40059-9090. Mr. Schroering is the organizer and manager of LEED who has met, counseled and conspired with the Defendants, Mr. Wagenseller and Mr. Simmons and the non-defendant, Mr. Huff, to breach the existing contractual relationships between Derby Capital/Derby JOB and Trinity/Delaware and Trinity/Kentucky thereby improperly and illegally purloining the majority share interest in GEE, a publicly traded company as is hereinafter described.

     10.    General Employment Enterprises, Inc. ("GEE") is an Illinois corporation organized and existing under and by virtue of the laws of the State of Illinois, with its principal place of business being located at One Tower Lane, Suite 2200, Oakbrook Terrace, Illinois 60181. It was incorporated in 1893.

     a.    Plaintiffs have reluctantly included GEE as a party in this litigation. That inclusion is necessary for the purpose effectuating any orders by the Court to properly instruct its stock transfer agent/agencies to re-title the ownership of the publicly traded securities that are the subject of this litigation. Further, GEE is included as a party to enable it to enter an appearance to protect the interests of the shareholders of GEE. Further, it is included as a party for the purpose of enabling it to be directly aware of the facts averred to in this Verified Complaint and to immediately and properly advise the investing public of the events that are described in this litigation and the progress of this litigation through to its conclusion. This is particularly important since Mr. Schroering has just been selected as a member of GEE's Board of Directors, in view of his *presumed (but fallacious) majority control of GEE stock* – which this Verified Complaint will establish has never been paid for and thus he has knowingly and deliberately caused the investing public *as well as GEE's Board of Directors to be grossly misled by this fraudulent misrepresentation.*

11.     U.S. Securities & Exchange Commission ("SEC") is a federal agency of the United States federal government that was created by Section 4 of the Securities Exchange Act of 1934 (now codified as 15 U.S.C. §78d), which holds primary responsibility for enforcing the federal securities laws and regulating the securities industry, the nation's stock and options exchanges, and other electronic securities markets in the United States.   In addition to the Securities Exchange Act of 1934 that created it, the SEC is charged with the responsibility of enforcing the Securities Act of 1933, the Trust Indenture Act of 1939, the Investment Company Act of 1940, the Investment Advisers Act of 1940, the Sarbanes–Oxley Act of 2002 and various other federal statutes whose purpose is to regulate the securities industry for the public's protection.

a.     The Plaintiffs have included the SEC as a 'nominal party' in this case for the purposes of enabling this federal agency to be properly, promptly and formally advised regarding its enforcement responsibilities as set forth by the facts, hereinafter.

b.     The Plaintiffs deem this inclusion as important and necessary in order for the SEC to be fully aware of the nefarious activities that have taken place during the operative events that are the subject of this Verified Complaint and have been orchestrated by the various Defendants during the series of transactions that are hereinafter set forth.

## JURISDICTION AND VENUE

12.     The United States District Court for the Western District of Kentucky has jurisdiction over this litigation because --

a.     Pursuant to 28 U.S.C. §1332, there is diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs; and

b.     Pursuant to 18 U.S.C. §1962, 1964, *et seq.*; and

c.      A portion of the issues intricately involved in this proceeding concern the operation, regulation and enforcement of federal statutes relating to publicly traded securities; and, as such, involve federal questions.

13.     Venue is proper in this district because –

a.      A substantial portion of the events giving rise to the claims herein occurred within the district of this federal district court; and

b.      The individual Defendants are subject to the personal jurisdiction in this district and the Plaintiffs are residents within this district at all times relevant hereto.

## EXECUTIVE SUMMARY OF THE RELEVANT FACTS

### Preface

While it may be unusual for a federal Complaint to contain an Executive Summary of the Relevant Facts, the complexities of the events surrounding this case require such a presentation as a starting point.

This is the story of an unimaginable fraudulent deceit involving the stock of a publicly traded company. It's a fraud dreamed up over the course of several months since mid-summer of 2012 to be perpetrated upon a group of businessmen with high esteem and reputation (the Plaintiffs) by an unmitigated scoundrel [1], whose name is Wilbur Anthony Huff ("Mr. Huff") and a cabal of other individual Defendants who have allowed their greed and artifice to subsume any sense of honor and morality.

Among those individual Defendants (joining Mr. Huff in this entire set of events) is his long-time behind-the-scenes lawyer, Mr. Wagenseller, who at one point or another during this set of events undertook legal work for every individual and their companies. He has also filed

---

[1]      While a descriptive term, it will be hereinafter given factual clarity and the certainty required in a fact section of a federal Verified Complaint.

multiple documents on the SEC's EDGAR filing system for the investing public to see – many of which, as will be shown, are knowingly fraudulent and false.

Among the souls, Mr. Wagonseller has led around on behalf of Mr. Huff is Mr. Huff's own son-in-law, Mr. Simmons, and Mr. Huff's daughter, Mrs. Simmons. As will be seen, this proved easy to do, because over the time that's elapsed during the events described herein it has become apparent to the Plaintiffs that neither know what they're doing and were merely trying to secure themselves and their future after Mr. Huff had slipped beneath a tsunami of federal court fraud judgments by the late spring of 2012. As will further be shown, Mr. Huff's future was to become even more problematic (!) when he was arrested on October 1, 2012 on a 48 page sealed criminal indictment brought by the U.S. Attorney's Office in New York City alleging in numerous interrelated schemes to defraud a multitude of individuals throughout the United States in what may be a fraud and bribery scheme approaching one hundred million dollars.

The fraudulent theft described in this Verified Complaint was further accomplished by the use of an unwitting, unsophisticated but intensely willing businessman, Mr. Schroering, who dreamed of basking in the public importance and glory that would be showered upon him in the midst of a galaxy of business stars along with the fame and wealth that accompanies big business recognition. The dream he acted out that has damaged the Plaintiffs required the loss of whatever personal values he possessed in the process because it required his willingness to conspire with Mr. Huff and Mr. Wagonseller and Mr. Huff's son-in-law, Mr. Simmons to knowingly, blithely and eagerly participate in the literal theft of a company (Trinity/Delaware) of which the Plaintiff's owned a 70% interest.  That company's only asset was over 9-million shares of a publicly traded company, GEE.   Mr. Schroering knowingly undertook the theft of that company's sole asset from several of his long-time friends and acquaintances and placed its

ownership in the name of LEED so as to shield himself from any direct liability for his personal nefarious actions.

Astonishingly, as a result of this deceit (at least for the time being) Mr. Schroering is a member of the Board of Directors of that publicly traded company (GEE) by virtue of his *supposed ownership* of the stock that was owned by Trinity/Delaware (the company he purloined from the Plaintiffs, herein). This is true despite the fact that after purloining the company and being caught red-handed by the Plaintiffs he contracted with the Plaintiffs to secure their payment for the value of his heist – and then knowingly breached that contract and has never paid one red cent of the agreed upon purchase price – all the while holding himself out to the investing public as if he owned control of this publicly traded company.

Shall we begin down the tortious path of greed and artifice worthy of an episode in *Dallas,* starring J.R. Ewing.

## RELEVANT BACKGROUND FACTS

14.     Derby Capital was formed on October 14, 2011, by a group of highly successful businessmen with varying business backgrounds for the purpose of pursuing business opportunities across America.

15.     Among several initial business proposals that were presented to Derby Capital was an opportunity offered by Trinity/Delaware to acquire a majority ownership interest in GEE, a publicly traded company, whose business platform occupied the employment staffing space.  It was an intriguing opportunity because of the fact that the company was well respected and had been in business for over a century (founded in 1893).

16.     Derby Capital assessed this opportunity as worthy of further examination, because the business model of GEE corresponded favorably with the business needs during this period of

an economic recession. Further, several members of Derby Capital had nationwide business connections and acquaintances who were fully capable of funding the growth of GEE.

**Derby Capital's Due Diligence**

17.     On or about November 17, 2011, Derby Capital entered into a non-binding letter of intent (that was prepared by Mr. Wagonseller on behalf of Trinity/Delaware) whereby it agreed to pursue a good faith due diligence examination of the staffing business opportunity that had been presented by Trinity/Delaware to Derby Capital. That non-binding letter of intent was signed by Derby Capital's representative manager and confirmed and agreed to by Trinity/Delaware's manager the Defendant, Mr. Simmons. A copy of this document is attached hereto as **Appendix 1**

a.     Additionally, on November 17, 2011, the Defendant, Mr. Wagonseller, prepared a Security Agreement between RFFG, LLC ("RFFG") (an Ohio limited liability company) and Derby Capital, which established that RFFG granted Derby Capital a security interest in certain GEE securities (one stock certificate #S12863 for 3,500,000 common shares of GEE stock and a second stock certificate #S12840 for 7,700,000 common shares of GEE stock) in support of a promissory note to Derby Capital $45,000. This Security Agreement was signed by Derby Capital's representative manager and by RFFG's representative manager the Defendant, Mr. Simmons. A copy of this Security Agreement and the stock certificates are attached hereto as **Appendix 2.**

b.     A copy of the Promissory Note, dated November 17, 2011 reflecting this transaction and bearing the Defendant Mr. Simmons' signature is attached hereto as **Appendix 3**.

c.     Finally, on November 17, 2011, the Defendant, Mr. Wagonseller, prepared an Escrow Agreement, whereby he became the Escrow Agent between Trinity/Kentucky and

Derby Capital for the amount of $45,000 owed to Derby Capital. This Escrow Agreement was signed by Derby Capital's representative manager and by RFFG's representative manager and Trinity/Kentucky's representative manager the Defendant, Mr. Simmons – as well as Mr. Wagonseller in his capacity as Escrow Agent. A copy of this Escrow Agreement is attached hereto as **Appendix 4**.

18. The November 17, 2011 non-binding letter of intent (**Appendix 1**) provided Derby Capital with a 30 day due diligence period, through and including December 17, 2011.

19. Among the actions taken by Derby Capital during the initial due diligence period was the formation of a wholly owned subsidiary, Derby JOB, which was designated to be Derby Capital's wholly-owned subsidiary that would handle the acquisition of controlling interest in Trinity/Delaware, should that be eventuated.

20. During the initial due diligence period, more particularly sometime around Thanksgiving of 2011, Derby Capital was startled to learn that Mr. Huff (Mrs. Simmons' father and Mr. Simmons' father-in-law) had pled guilty to a felony (an insurance-related fraud) in 2004 before Judge John G. Heyburn III in the U.S. District Court for the Western District of Kentucky.

a. Derby Capital immediately confronted Mr. Huff about this revelation. Mr. Huff, expressing great regret and contrition over his self-described "misstep," offered that he had pled guilty to insurance fraud in order to protect his father for a mistaken transaction his father had undertaken and that Judge Heyburn's sentence was very lenient. Upon examination by Derby Capital, this representation by Mr. Huff appeared to be reasonably accurate.

b. When directly confronted as to any further legal infirmities, Mr. Huff offered that there were none and he assured Derby Capital members of his determination to atone for his mistakes.

21. Additionally, during the initial due diligence period, several other questions arose, among them being the validity of Trinity/Delaware's ownership of the 9,325,688 shares of GEE. Consequently, it became necessary for Derby Capital to extend the initial due diligence period. This was accomplished and Mr. Wagonseller went to work (like a busy little beaver) to establish the validity of Trinity/Delaware's stock ownership. [2]

a. On December 12, 2011, Defendants, Mr. Wagonseller and Mr. Simmons, notified Derby Capital that Gregory L. Skaggs ("Mr. Skaggs") had sold his membership interests in PSQ, LLC to Trinity/Delaware, free and clear of all encumbrances for a purchase price of $500,000. This membership interest included 9,325,281 shares of GEE stock.

b. The details of Mr. Skaggs' sale of GEE stock were subsequently prepared and filed with the SEC by the Defendant, Mr. Wagonseller, in the form of a 13D EDGAR filing on December 27, 2011. **(See: Appendix 5)**

22. So, based upon this information provided by Defendants, Mr. Wagonseller and Mr. Simmons, and subsequently filed with the SEC by Mr. Wagonseller's EDGAR filing -- on December 13, 2011, Derby Capital loaned Trinity/Delaware or Trinity/Kentucky another $14,000, which represented contractual consideration for the due diligence period to be extended an additional 30 days. A copy of the Promissory Note, prepared by the Defendant, Mr. Wagonseller, reflecting this transaction and bearing the Defendant, Mr. Simmons', signature is attached hereto as **Appendix 6.**

23. A few days later and to further reflect Derby Capital's further good faith during the extended due diligence period, on December 21, 2011 Derby Capital loaned an additional

---

[2] During the course of this Verified Complaint there will be reference to several different totals of GEE common stock that is owned by Trinity/Delaware; namely 9,325,281 and 9,325,688. This variation will require clarity during the discovery portion of this litigation. However, there is no question that an amount in excess of 9 million three hundred thousand shares of GEE common stock are owned.

$16,000 to Trinity/Delaware or Trinity/Kentucky to assist in its cash flow during the due diligence period. A copy of the Promissory Note, prepared by the Defendant Mr. Wagonseller, reflecting this transaction and bearing the Defendant Mr. Simmons' signature is attached hereto as **Appendix 7.**

24.     Therefore, as of December 21, 2011, Derby Capital was owed the total of $75,000 in promissory notes based on loans made by Derby Capital to Trinity/Delaware or Trinity/Kentucky.

25.     As further security for the now $75,000 in promissory notes due Derby Capital from Trinity/Delaware or Trinity/Kentucky, the Defendant Mr. Simmons agreed that the $75,000 would be applied to the purchase price for the purchase of a 70% interest in Trinity/Delaware, if Derby Capital determined to proceed with the purchase agreement.

a.     To further the transaction that was taking place between the Derby Capital and Trinity/Delaware, the Defendant Mr. Wagonseller also drafted an Amended Operating Agreement for Trinity/Delaware that was signed on December 22, 2011 by the Defendants Mr. and Mrs. Simmons, which appointed two Derby Capital members, J. Sherman Henderson ("Mr. Henderson") and Jeffrey Moody ("Mr. Moody") as the managers of Trinity/Delaware. A copy of this Amended Operating Agreement is attached hereto as **Appendix 8.**

26.     As would continue to be the case -- at some point around the Christmas holidays of 2011 Derby Capital learned that Mr. Huff had been far less than forthright about his 'legal infirmities.' As a matter of fact, he had lied through his teeth with a straight face about them. There were far more serious problems than he had revealed around Thanksgiving. Namely, it was learned that he had several judgments against him from federal courts in Miami and in

Seattle that involved serious allegations of fraudulent conduct alleged by the SEC (in Miami) and the State of Washington Insurance Commissioner (in Seattle).

a.      Derby Capital became deeply concerned about this overt disingenuous lack of candor by Mr. Huff.

b.      Derby Capital re-doubled its due diligence regarding these matters and learned that both judgments were on appeal to the appropriate federal Circuit Court of Appeal. Furthermore, an examination of the pleadings clearly showed that none of the issues before the Miami and Seattle federal courts had anything to do with the securities of GEE, which were involved in Derby Capital's discussions with the Defendants Trinity/Delaware, Trinity/Kentucky, Mr. and Mrs. Simmons and Mr. Wagonseller.

c.      Derby Capital confronted Mr. Huff regarding these matters and Mr. Huff assured Derby Capital representatives that there was no connection between these two (2) cases on appeal and the GEE securities.  Further, Mr. Huff assured Derby Capital that he intended to conduct an exemplary life from that point forward, that he had made mistakes in the past and that he was 're-born.'  Derby Capital members noted that behind his desk lay an open Bible and a prominent sign on his desk asked the proverbial question: "Should I be doing this?"

d.      Additionally, Derby Capital interviewed, at length, both Mr. and Mrs. Simmons.  They both insisted that they were fully in charge of and operating Trinity/Delaware and Trinity/Kentucky and that Mr. Huff merely acted as a father and father-in-law adviser to them, just like any father or father-in-law would.

e.      Derby Capital undertook additional due diligence regarding these cases that involved Mr. Huff.

26.     As was previously averred at ¶21(b), on December 27, 2011, the Defendant Mr. Wagonseller caused to be filed a 13D EDGAR filing with the SEC indicating that an Interest Purchase Agreement had been entered into on December 12, 2011, between Mr. Skaggs ("Seller") and Trinity/Delaware ("Buyer") whereby Mr. Skaggs transferred his 100% interest in PSQ, LLC to Trinity/Delaware for the sum of $500,000 with 2 down payments of $61,000 on December 12th and January 12th and 9 monthly payments on the 12th day of each month ending on October 12, 2012 in the amount of $23,778.  Mr. Skaggs represented and warranted in the Interest Purchase Agreement (prepared by the Defendant Mr. Wagonseller) that PSQ's sole asset consisted of 9,325,281 shares of GEE stock.  Mr. Skaggs signed the 13D EDGAR filing on behalf of PSQ and the Defendant Mr. Simmons signed on behalf of Trinity/Delaware. Copies of this 13D EDGAR filing are attached hereto as **Appendix 5.**

27.     Based upon these SEC filings, hereinabove referenced, and its further due diligence aided (in some measure) by the deeper meanings of spiritual rejuvenation and human reconstitution and forgiveness extant during the annual December religious holiday season, Derby Capital reached a conclusion that Mr. Huff was a reformed man and that the Defendants Mr. and Mrs. Simmons were honorable young persons with integrity.

28.     Consequently, Derby Capital decided to go forward with the transaction.

### Derby Capital's and Trinity/Delaware's agreement regarding the financing of the transaction involving Derby Capital's acquisition of a 70% ownership of Trinity/Delaware

29.     On January 3, 2012, the Defendant, Mr. Wagonseller, prepared and filed two (2) 13D documents with the SEC EDGAR filing system reflecting a substantial change of ownership of GEE common stock. His filing notified the investing public that Jeff Moody ("Mr. Moody") and J. Sherman Henderson ("Mr. Henderson") (both members of Derby Capital) were now

"reporting persons" for Trinity/Delaware and Trinity/Kentucky and controlled 12,825,281 common shares of GEE – which was comprised of the 3,500,000 shares Trinity/Kentucky received from RFFG on December 21, 2011 and the 9,325,281 shares Trinity/Delaware acquired from Mr. Skaggs on December 12, 2011. **(See: Appendix 9)**

30.     During Derby Capital's due diligence period it had entertained discussions with King Southern Bank ("KS Bank") about the possibility of securing financing for the purchase of an interest in Trinity/Delaware, should it make that decision. There was immediate interest on the part of KS Bank.

31.     Following its decisions to acquire a 70% interest in Trinity/Delaware and the January 3rd filing with the SEC, early in January 2012 Derby Capital entertained serious discussions with representatives of the King Southern Bank ("KS Bank") for the purposes of obtaining a loan that would be secured (in part) by Derby Capital's ownership interest in Trinity/Delaware (which included the 9,325,688 shares of GEE common stock).

32.     Shortly thereafter, KS Bank agreed to establish a line of credit for Derby Capital in the amount of $250,000 for the purposes of its down payment to Trinity/Delaware, with the full understanding and agreement by the Defendants Trinity/Delaware, Mr. and Mrs. Simmons and Mr. Wagonseller that the GEE common stock would be pledged as collateral for the loan.

33.     Based upon the commitment of KS Bank, on January 10, 2012 (with Derby Capital's due diligence completed) a letter agreement was prepared by the Defendant Mr. Wagonseller that was addressed to the Defendant Trinity/Delaware and signed by Derby Capital's manager/COO, Mr. Moody. This letter agreement confirmed the Defendant Mr. Simmons' agreement, as manager of the Defendant Trinity/Delaware, whereby Derby Capital received a 70% interest in the Defendant Trinity/Delaware (which, of course, included 70% of

the GEE stock owned by it) for the payment of $500,000 to the Defendant Trinity/Delaware as follows - a $212,000 payment at the closing, with the Defendant Trinity/Delaware forgiving $75,000 of the purchase price (due to the prior loans from Derby Capital [previously discussed] with the balance being paid in six equal monthly installments. The Agreement further provided that Derby Capital would assume the responsibility for 70% of the remaining payment owed to PSQ, LLC by the Defendant Trinity/Delaware, which total amount was $1,800,000, meaning that Derby Capital's remaining responsibility was the sum of $1,260,000. Finally, of significant importance is the fact that ¶4 of the Agreement allows Derby Capital to pledge the GEE shares "... to the lender financing the Transaction." A copy of this Agreement is attached hereto as **Appendix 10**.

34. Two days later -- on January 12, 2012 -- Derby Capital closed on its line of credit from KS Bank and provided an additional payment of $212,000 to Trinity/Delaware (from the proceeds of the KS Bank loan that was contingent upon Trinity/Delaware was able to pledge the GEE stock as security for the Derby Capital loan -- in an acceptable manner to the KS Bank).

a. Of significance is the fact that on January 12, 2012, a "Limited Liability Company Authorization Resolution" provided by KS Bank was signed by the Defendant Mr. Simmons (on behalf of Trinity/Delaware) representing that Mr. Henderson and Mr. Moody, both being members of Derby Capital, were "...engaged in a business under the trade name of Trinity HR Services, LLC...." and authorizing Mr. Henderson only to "Borrow money on behalf and in the name of the Limited Liability Company, sign, execute and deliver promissory notes or other evidences of indebtedness."

b. Further, by his signature, the Defendant Mr. Simmons explicitly authorized Mr. Henderson only to "Endorse, assign, transfer, mortgage or pledge bills receivable,

warehouse receipts, bills of lading, stocks, bonds, real estate or other property owned or hereafter owned or acquired by the Limited Liability Company as security for sums borrowed, and to discount the same, unconditionally guarantee payments of all bills received, negotiated or discounted and to waive demand, presentment, protest, notice of protest and notice of non-payment."

      c.      The Limited Liability Company Authorization Resolution was signed by the two (2) Designated Members of Trinity/Delaware; namely: Mr. Moody and Mr. Henderson and is attached hereto as **Appendix 11**.

      d.      Further, a copy of the Commercial Security Agreement provided by the KS. Bank indicating the bank's right to hold the said stock as collateral for the loan and the right to approve any transfer of the shares is attached hereto as **Appendix 12**.

      e.      Finally, on January 13, 2012, and of considerable significance, pursuant to his authority as established by the Limited Liability Company Authorization Resolution **(Appendix 11)** on behalf of Trinity/Delaware, Mr. Henderson signed a Stock Assignment to the KS Bank assigning 9,325,688 shares of GEE common stock as security for the KS Bank loan. To this Stock Assignment was attached a copy of the 'Brokerage Account' along with copies of the actual GEE securities that were being held as collateral. **(Appendix 13)**

35.      Therefore, as of mid-January 2012, the two Designated Managers of Trinity/Delaware were Mr. Moody and Mr. Henderson, the two Reporting Persons to the SEC as controlling persons of Trinity/Delaware were Mr. Moody and Mr. Henderson and the GEE stock certificates representing 9,325,688 shares of GEE common stock were pledged to the KS Bank as collateral for a $250,000 line of credit to Derby Capital – the purpose of which was to pay for

the initial payment for Derby Capital/Derby JOB's acquisition of a 70% interest in Trinity/Delaware, whose sole asset was the 9,325,688 shares of GEE common stock.

**Events following Derby Capital's acquisition of 70% interest in Trinity/Delaware**

36.    While the January 10th Letter Agreement **(Appendix 10)** called for a "Definitive Agreement" to be executed by January 31, 2012, a dispute arose between Derby Capital and Mr. Wagonseller as to the definition of a "Definitive Agreement." Derby Capital's concept was that the "Definitive Agreement" was to summarize all of the transaction that had occurred (as is written in this section of this Verified Complaint). Mr. Wagonseller's concept was considerably different, in that he didn't want such a rendition to be re-stated in such a document, even though it had been thoroughly discussed in the Edgar filings he had created.

a.    Needless to say, Derby Capital became concerned, at this point, with Mr. Wagonseller's recalcitrance – once the transaction had been consummated. Derby Capital's reason for concern was that Mr. Wagonseller's recalcitrance involved a trivial point. It appeared to Derby Capital that Mr. Wagonseller was merely looking for a way to delay or put a hitch in the progression of the agreements that had been effectuated.

b.    Unbeknownst to Derby Capital at that time (mid-January 2012) Mr. Huff had lost his appeal to the Fifth Circuit Court of Appeals meaning that he was personally liable to the SEC for a sum of money approaching $20 million dollars – a fact that upon information and belief the Plaintiffs maintain was instantly known by Mr. Wagonseller.

37.    After considerable friction between Derby Capital and Mr. Wagonseller, on or about March 30, 2012 Derby JOB (designated as "Buyer") signed an Interest Purchase Agreement with Trinity/Delaware (designated as "Seller") to purchase 700 of the outstanding 1,000 units of Class A Membership Interests. **(See: Appendix 14)**

38.     Once Derby Capital began loaning money to Trinity/Delaware and Trinity/Kentucky and had begun its due diligence process on GEE, and when Derby Capital had the funding and payment obligations in place to secure its orderly purchase of the 70% interest in Trinity/Delaware (which, together with the stock owned by Trinity/Kentucky represented controlling stock interest in GEE) a concentrated effort was initiated by Derby Capital to effectuate mergers of other staffing companies into GEE that would serve to grow GEE's platform and enhance its value in the securities market.

a.     Reflective of Derby Capital's intentions to effectuate mergers into GEE to enhance its platform and its value, are two (2) Finder Agreements that were entered into between Derby Capital and GEE on February 1, 2012. These Finder Agreements provided fees for Derby Capital's securing of acquisition candidates for GEE in the amount of 2% of the gross value of the total transaction and a 3% fee on any capital that is raised for GEE as debt and a 6% fee for any capital raised as equity. A copy of these two (2) Finder Agreements is attached hereto as **Appendix 15.**

b.     Once these Finder Agreements were effectuated in February 2012 Derby Capital had assiduously pursued various acquisition candidates for GEE with several different funding sources including, but not limited to Nashville, Cincinnati and Chicago.

c.     Members of Derby Capital travelled to many cities, met with many owners of staffing companies in the effort to begin the enhancement of the platform and value of GEE and effectuate the Finder Agreements it possessed with GEE.

(1)     Of interest is the fact that, despite the events that have transpired (which are the subject of this Verified Complaint [to be described hereinafter]) the Term of neither Finder Agreement has expired by written notice from either party.

39.     So by late spring 2012, Derby Capital had paid $500,000 cash to Trinity/Delaware for the purchase of a 70% interest in Trinity/Delaware, which included a 70% interest in the 9,325,688 shares of GEE common stock (which was Trinity/Delaware's sole asset).  Further Derby Capital had paid another $25,000 for legal fees that Trinity/Delaware had accumulated. As of this time, Derby Capital was completely current on all its obligations to Trinity/Delaware and the only obligation remaining on the purchase price for its 70% interest in Trinity/Delaware (which included the 9,325,688 shares of GEE common stock) was a promissory note that was not due to be paid until December 2013.

40.     However, another problem developed during the late spring of 2012. Again, Mr. Wagonseller began delaying the drafting and signing of another agreement – this time it was the Amended and Restated Limited Liability Company Agreement that was provided for on the first page of **Appendix 14**.  It was via this Agreement that 700 Class A Units of Trinity/Delaware were to be formally provided to Derby JOB.  For weeks on end Mr. Wagonseller found one reason after another to delay the signing of this Amended and Restated Limited Liability Company Agreement – although a final draft had been prepared and agreed to by Derby Capital.

41.     As was always the case, there was a reason for Mr. Wagonseller's recalcitrance and delay.  Upon information and belief of Derby Capital, the reason was that Mr. Wagonseller was 'serving' the interests of Mr. Huff and by extension, Mr. Simmons and Mrs. Simmons – and not the interests of Trinity/Delaware or its majority owner, Derby Capital/Derby JOB.  Shortly that fact was to be recognized by Derby Capital/Derby JOB (as is explained in ¶42, hereinafter)!

**Summer of 2012:**
**Derby Capital's planning of the strategic development of GEE**
**and**
**the purloining of Derby's 70% interest in Trinity/Delaware**
**by Messrs. Schroering, Simmons, Wagonseller and Huff**

42.     Along with its determination to enhance the value of GEE, Derby Capital continued to conduct a parallel awareness of Mr. Huff's legal travail. This continual examination caused it to learn in mid-June that on May 2, 2012, Mr. Huff had lost his final appeal in the 9th Circuit Court of Appeals. Mr. Huff had not appealed his January 2012 loss of his appeal to the Fifth Circuit of the federal court verdict in Miami, Florida case against him and in favor of the S.E.C. Under the rules of the United States Supreme Court, Mr. Huff had 90 days to file a *writ of certiorari* on the May 2, 2012 loss of his appeal of the adverse jury verdict in Seattle to the Ninth Circuit. Those 90 days would expire on in early August 2012. By that time, Mr. Huff would owe more than $35 million in combined final judgments to the S.E.C. and the Insurance Commissioner of Washington state.

a.     As the days move forward in this Fact Section, the Court will note that the date of early August 2012 was to prove to be propitious.

43.     Unbeknownst at the time, but later learned was that on June 6, 2012, Mr. Schroering formed LEED HR, LLC; and upon information and belief had begun discussions with Mr. Wagonseller, Mr. Simmons and Mr. Huff to purloin Derby Capital's interest in Trinity/Delaware and gain control GEE.

### Oh what a web we weave when we practice to deceive.

44.     During a day-long mid-August meeting of Derby Capital's managers it was mentioned in passing that a 'rumor' was circulating among several mutual friends of Derby Capital managers of that Mr. Simmons, with the aid and assistance of Mr. Wagonseller (who since December 2011 had been acting as Trinity/Delaware's counsel and who had prepared all the previous documents that have been discussed and who caused all the previously mentioned

documents to be filed in the SEC's EDGAR filing system) was in the final stages of preparing the sale of Trinity/Delaware to Mr. Schroering and his newly-formed LEED HR, LLC.

      a.    This notion was laughed off, because the contractual arrangements for Derby Capital's purchase were in place and Derby Capital was current with all its purchase obligations. Additionally, Derby Capital was working closely with the management of GEE and in the process of finalizing potential acquisition candidates for GEE, in accordance with Derby Capital's requirements under the Finder Agreements it had with GEE. **(See: Appendix 15)** Furthermore Mr. Schroering was a personal friend of several Derby Capital managers and they didn't believe that he would have been undertaking such a diabolical act.

**Mr. Schroering, by and through LEED HR, LLC**
**and**
**with the advice and assistance of Mr. Wagonseller, Mr. Simmons and Mr. Huff**
**purloins Derby Capital's interest in Trinity/Delaware**

    45.    Without any direct consultation with Derby Capital or its managers or anyone affiliated with Derby Capital, on August 21, 2012, Mr. Simmons (the son-in-law of Mr. Huff) and at the direction and advice and, upon information and belief by Derby Capital, the control of Mr. Huff and with the advice and counsel of Mr. Wagenseller, knowingly and fraudulently entered into an agreement to sell the 70% of Trinity/Delaware (of which Derby was, and is, the owner of record) to LEED HR, which had been formed and was owned by Mr. Schroering.

      a.    Upon information and belief, Mr. Wagenseller provided counsel and advice for Mr. Schroering in this transaction. Derby was not aware of and did not approve of this agreement.

      b.    Among the many examples of facts that support Derby's information and belief as to Mr. Wagonseller's "ultimate control" over this action is that on August 28, 2012, the record of this August 21st transaction was filed with the S.E.C. EDGAR filing system. Mr.

Wagonseller, as counsel for Trinity/Delaware, had drafted and filed every EDGAR filing that was previously filed regarding Derby Capital's purchase of its 70% interest in Trinity/Delaware.

        c.      Later, when challenged by Derby Capital members about this filing, Mr. Wagonseller admitted that for several months he had counseled Mr. Schroering with regard to the surreptitious acquisition of Derby Capital's interest in Trinity/Delaware. He also admitted to the drafting of the documents to effectuate the purloining of Derby's interest <u>and</u> was the individual who arranged for the EDGAR filing of the documents <u>that he prepared and that are attached hereto as</u> that are attached hereto as **Appendix 16.** [3]

        d.      When one reads **Appendix 16** and the confusing and complex set of transactions that were undertaken to accomplish this fraudulent activity, it is unquestionable that the creation of this fraudulent 'broth' had to take place over many months.

      46.      Upon discovering and reading the contents of **Appendix 16**, several Derby Capital members who knew Mr. Schroering advised him twice (once in the presence of Mr. Huff) that Mr. Simmons had no authority to effectuate the sale of Trinity/Delaware's assets and that Mr. Wagonseller was fully aware of that fact because he had drafted the documents that created that authority in Mr. Moody and Mr. Henderson, as the 'reporting parties' for Trinity/Delaware.

        a.      Furthermore, these also members of Derby Capital advised Mr. Schroering that this transaction that had been reported publicly in an SEC EDGAR filing could well represent an attempt to perpetrate a fraud on the KS Bank, because these securities were pledged

---

[3]    As will be discussed in the relevant Count, subsequently, these facts are sufficient to find Mr. Wagonseller liable for his conduct under the recent standards established by the U.S. Supreme Court in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2111) because his conduct exemplified his "ultimate authority" over a series of false and misleading documents that were filed with the SEC's Edgar filing system – as will be hereinafter discussed.

as collateral on Derby Capital's loan from that bank – and that Mr. Simmons has agreed to this collateral pledge in January 2012 and that Mr. Wagonseller was well aware of it.

       b.    Further, Mr. Schroering was advised that Derby Capital intended to file a lawsuit against him, his company, LEED and Mr. and Mrs. Simmons unless arrangements were made to pay it for its interests in Trinity/Delaware that had been purloined without payment.

       c.    Mr. Schroering and Mr. Huff were unresponsive and expressed no concern over Derby Capital's demands.

       d.    Subsequently, Derby Capital informed Messrs. Schroering, Huff, Simmons, and Wagenseller in writing.  This seemed to awaken their senses, to an extent. In response to Derby Capital's written notice, Trinity/Delaware told Derby Capital that it desired to buy Derby Capital/Derby JOB's 70% interest, which would put Trinity/Delaware and Mr. Simmons in the position where they could legitimately sell the GEE shares to LEED – despite the fact that they hadn't legitimately sold them to LEED, even though the sale had been reported in an SEC EDGAR filing.

       e.    As a result of these meetings and Derby Capital and Trinity/Delaware entered into an Agreement providing for the payment to Derby Capital of the cash sum of $750,000 "…in return for Derby's Interest in Trinity."  The payments were to be made in two segments: $250,000 on or before the close of business on September 14, 2012 and the balance to be paid on or before the close of business on September 30, 2012.  There are other provisions to that Agreement.  A copy of it is attached hereto as **Appendix 17.**

       f.    Further, on September 12, 2012, Mr. Schroering, on behalf of LEED, signed a Pledge Agreement, whereby he and LEED acknowledged Derby Capital's security interest in the contractual payment set forth in the August 21, 2012 Contract (which is attached

as **Appendix 16)** and further agreed not to make any payments other than as contemplated in said Contract. This Pledge Agreement is attached as **Appendix 18**.

47.    Mr. Wagonseller further compounded his exposure to liability by filing an additional document in the SEC's EDGAR filing system on September 12, 2012 on behalf of Mr. Schroering reflecting that Mr. Schroering and Mr. Moody, on behalf of Derby Capital, had agreed that any payments made by LEED to Trinity/Delaware will be used to honor the contractual agreement between Derby Capital and Trinity/Delaware as set forth in **Appendices 17 and 18**. A copy of this SEC EDGAR filing is attached as **Appendix 19.**

48.    The very next day, September 13, 2012, Mr. Wagonseller filed a multi page 13D EDGAR SEC filing for the apparent purpose of re-stating everything that had been previously stated in various attachments. It is attached, hereto, as **Appendix 20.** The relevant portion to the instant litigation is found at page 17 of **Appendix 20,** which is the August 21, 2012 Stock Purchase Agreement between LEED and Trinity/Delaware.    ¶2 of this Stock Purchase Agreement informs the public that the sale comprises 9,325,281 shares of GEE common stock and ¶2.1 describes the immediate payment schedule as follows:

> The purchase price of $2,274,000 (the "Purchase Price") ... is payable (i) $37,900 in cash at closing, (ii) $721,000 not later than 45 days after the date hereof [August 21, 2012]...."

a.    So while the September 12th Agreement **(Appendix 17)** calls for Trinity/Delaware to pay Derby Capital in 2 installments: $250,000 on or before September 14, 2012 and $500,000 on or before September 30, 2012 and while the payment under this Agreement was securitized by a Pledge Agreement signed by Mr. Schroering that was entered into on September 12th also **(Appendix 18)** – the actual Stock Purchase Agreement between LEED and Trinity/Delaware calls for a $37,900 payment on closing (which was August 21st) and

a $721,000 payment 45 days after August 21, 2012 – or Friday October 5, 2012.  **(Appendix 20, page 17)**

      b.     Therefore, the documents written and filed with the SEC by Mr. Wagonseller's EDGAR filings are inconsistent in their payment deadline provisions and, upon Derby Capital's information and belief, Mr. Wagonseller had drafted each of the documents that were filed in the SEC EDGAR filing system and had caused them to be filed at his direction.

      49.     However, over the next several weeks <u>that</u> inconsistency became irrelevant because there was never a <u>single red cent of payment</u> made by Mr. Schroering or LEED that was <u>ever received by Derby Capital, either from LEED or from Trinity/Delaware.  Not on September 14, 2012 or September 30, 2012 or October 5, 2012.</u>

      50.     Furthermore, from the date of October 5, 2012 to the present date of the filing of this litigation Derby Capital has <u>never been paid a single penny</u> by Mr. Schroering, LEED, Trinity/Delaware, Mr. or Mrs. Simmons or even the scoundrel, Mr. Huff.

      51.     Of course, a payment from Mr. Huff would be quite difficult because he didn't commit to any payment, but he does have more than $30 million in federal final judgments owed to the SEC and to the Secretary of Insurance of Washington state.

      a.     Additionally, on October 1, 2012, a previously sealed 48-page indictment in the United States District Court for the Southern District of New York was unsealed against Mr. Huff accusing him of crimes of fraud and bribery and illegal banking schemes in 13 different counts involving what could approach a $100 million in thefts. For the Court's perusal, this 48-page indictment is attached as **Appendix 21** and a part of the Plaintiffs' evidence as it will assist in establishing the wholesale debauchery and lack of moral compass of the Defendants in this

case, who have consulted and consorted with Mr. Huff to effectuate the deceit that's been practiced upon the Plaintiffs.

52.     Mr. Wagonseller has further compounded his nefarious activities associated with the transactions he masterminded with Mr. Schroering, by drafting documents for the purposes of filing with the SEC via an EDGAR filing he proposed to undertake which would have represented -- under the names of Mr. Henderson and Mr. Moody – that they agreed Derby Capital was no longer in control of Trinity/Delaware and correspondingly its sole asset, that being the 9,326,688 shares of GEE's common stock. Mr. Henderson and Mr. Moody refused to allow this to occur and Mr. Wagonseller advised his EDGAR filer that she should not file these documents.

53.     To further add to the tragedy Mr. Schroering's deceitful conduct he has now involved a legitimate and wholesome company, GEE, in his 'web of deceit.'

a.     On November 26, 2012, the Board of Directors of GEE appointed Mr. Schroering to a Directors position on the Board of this publicly-traded company, even though Derby Capital and Derby JOB, LLC have never received one red cent for the GEE stock owned by Trinity/Delaware – of which Derby Capital/Derby JOB, LLC owned a 70% interest -- that Mr. Schroering, Mr. Simmons purloined when they transferred Derby Capital's 70% interest in Trinity/Delaware to Mr. Schroering's company, LEED. A copy of this SEC EDGAR filing occurred on November 27, 2012 and is attached as **Appendix 22**.

b.     Additionally, and to underscore the incredibly fraudulent gravitas of Mr. Schroering and his shell company, LEED, the day of the filing of this Verified Complaint found the online edition of Yahoo Finance concluding its "Business Summary" of GEE, as follows:

**"As of August 21, 2012, General Employment Enterprises, Inc.
operates as a subsidiary of LEED HR, LLC."**

54.     One last fact that says it all – while Derby Capital has not agreed with any extension of time to the payment schedules contained in the September 12, 2012 Agreement, there's virtually not been a week transpire since October 5, 2012 (the final date of the various possible dates of Mr. Schroering's written commitments to pay for the GEE stock he surreptitiously purloined) when a member of Derby Capital hasn't been told by Mr. Schroering that he was either getting ready to make good on his purchase commitment or that he had arranged for financing that would allow him to pay his financial obligation to Derby Capital.

        This includes a statement that Mr. Schroering made over the telephone to a member of Derby Capital as recently as less than a week prior to the filing of this litigation.

55.     Derby Capital, in good faith, has tolerated the lies and deceit long enough in an effort to allow Mr. Schroering and Mr. Simmons to make legal and legitimate their improper and illegal theft of Derby Capital's 70% interest in Trinity/Delaware, by simply honoring their written commitments of September 12, 2012.

**"Oh what a tangled web we weave, when first we practice to deceive"**
**Sir Walter Scott, *Marmion*, 1808**

### COUNT I

**Breach of Written Contract**
**by**
**Defendants Trinity/Delaware, Mr. and Mrs. Simmons,**
**Mr. Wagonseller, Mr. Schroering and LEED**

56.     The allegations contained in paragraphs 1 through 55 are incorporated as if fully set forth in this Count I.

57.     The Defendants Mr. Simmons, individually and in his capacity as a minority partner in Trinity/Delaware and Mr. Schroering, individually and in his capacity as the organizer and manager of LEED entered into written contracts, promises and assurances to the Plaintiffs, Derby Capital and Derby JOB, that they would purchase the 70% interest of the Plaintiff in Trinity/Delaware for the sum of $750,000. Definitive dates and times were established for this purchase in accordance in a series of agreements and promises as set forth in the Relevant Factual Background section, hereinabove, along with the **Appendices** noted, therein.

58.     The Defendants Mr. Simmons, individually and in his capacity as a minority partner in Trinity/Delaware and Mr. Schroering, individually and in his capacity as the organizer and manager of LEED have breached these written contracts by failing to purchase the Plaintiffs' interests as committed by their written promises and assurances.

59.     The written contracts between the parties were entered into in Kentucky. Under long standing Kentucky law four (4) elements must exist for an enforceable written contract; namely: (1) the parties must have the capacity to enter into a contract, (2) the parties must manifest their intent to be bound by the contract, (3) the enforceable contract must have a legal purpose and (4) there must be valid and sufficient consideration.

60.     All four (4) pre-requisites for an enforceable written contract under Kentucky law exist in this case and those written contractual understandings were breached by total and complete non-payment – for months on end.

61.     As a direct and proximate result of the breach by the Defendants Mr. Simmons, individually and in his capacity as a minority partner in Trinity and Mr. Schroering, individually and in his capacity as the organizer and manager of LEED, the Plaintiffs have suffered material and substantial damages in an amount of the value of the contract, which totals $750,000, plus an

amount to be determined at the trial of this case for additional costs, expenses and losses incurred as a result of the breach and the requirement to enforce its breach in court.

## COUNT II

### UNJUST ENRICHMENT
### as against
### Defendants LEED and Mr. Schroering

62.    The allegations contained in paragraphs 1 through 61 are incorporated as if fully set forth in this Count II.

63.    The Defendants LEED and Mr. Schroering's have been unjustly enriched as a result of their breach of their contractual agreements with the Plaintiffs.  That unjust enrichment has enabled Mr. Schroering to initiate the activities that Plaintiffs had initiated to expand the platform and business of GEE and thereby enhance the value of its common stock.  Furthermore, Mr. Schroering has been selected as a member of the Board of Directors of GEE, solely as a result of the breach of his contract with the Plaintiffs and his assertion that he controls the majority of GEE's common stock – and assertion that is totally false.

64.    The damage to the Plaintiffs of the Defendants Mr. Schroering and LEED's unjust enrichment is either

    a.    the loss in the closing stock price on August 28, 2012 of 70% of 9,326,688 shares of GEE common stock to the date of the trial of this case; or

    b.    the increase in the closing stock price on August 28, 2012 of 70% of the 9,326,688 shares of GEE common stock to the date of the trial of this case, which has been denied to the Plaintiffs by the Defendants Mr. Schroering's and LEED's theft of said securities.

65.    The Plaintiffs are entitled to a recovery from the Defendants, LEED and Mr. Schroering, for the stated Defendants' unjust enrichment.

## COUNT III

### NULLIFICATION AND RECESSION OF CONTRACT
### as against
### Defendants Trinity/Delaware, Mr. and Mrs. Simmons,
### Mr. Schroering and LEED

66.    The allegations contained in paragraphs 1 through 65 are incorporated as if fully set forth in this Count III.

67.    In the alternative, Derby Capital/Derby JOB assert that this Court or the jury should rescind the contract and order the nominal Defendant, GEE, to instruct it's transfer agent to place 6,528,682 shares of GEE common stock into the name of Derby Capital or Derby JOB, which is the sum equaling 70% of 9,326,688 shares of GEE common stock that Derby Capital owned by virtue of its 70% ownership of Trinity/Delaware.

### COUNT IV

### PUNITIVE DAMAGES
### FOR FRAUD INDUCEMENT TO CONTRACT
### UNDER THE LAW OF KENTUCKY
### as against
### Mr. Schroering, LEED, Trinity/Delaware and Mr. Simmons

68.    The allegations contained in paragraphs 1 through 67 are incorporated as if fully set forth in this Count IV.

69.    The Plaintiffs assert and have proven that the Defendants, Mr. Schroering, LEED, Mr. Simmons and Trinity/Delaware never had any intention of paying for the Plaintiffs interests in Trinity/Delaware, which amounted to 70% of the sole asset of Trinity/Delaware, namely 9,326,688 shares of GEE's common stock.

a.  One reason, among others, is the fact that none of the Defendants had the financial capacity to write the checks in the amount of $750,000 that was required to pay the Plaintiffs in accordance with the contract they entered into with the Plaintiffs.

70.  At the time they made these representations, the Defendants Mr. Schroering, LEED, Mr. Simmons and Trinity/Delaware (i) knew they would be unable to meet this funding commitment, or (ii) made this funding commitment recklessly; or (iii) failed to exercise reasonable care or competence in obtaining or communicating this information.

71.  These representations were material in that the Plaintiffs relied upon the truth of these representations and did not pursue alternative financial opportunities.

72.  Under the long-established law of Kentucky damages are available for the breach of a contract in an amount of the value of the contract and punitive damages are also awardable against the defrauding party as a punishment for the fraudulent inducement of the contract that the defrauding party has breached. [4]

73.  As punitive damages for the fraudulent inducement to contract with no ability or intent to honor the contract, the Plaintiffs are entitled to an Order of this Court or should be awarded a verdict by a jury on Count IV, for the value of the remaining 30% of GEE's common stock that was owned by Trinity/Delaware or the total of 2,798,006 shares as punitive damages under the law of Kentucky for the breach of their contract with the Plaintiffs.

---

[4]  See: *Davis v. Siemens Medical Solutions, USA, Inc.*, 399 F.Supp. 2d 785 (W.D.Ky. 2005); *Schoerlucke v. Hall*, 249 S.W.2d 130 (Ky.App. 1952), *Moseley v. Owensboro Municipal Housing Comm.*, 252 S.W.2d 880 (Ky. 1952) and *Hanson v. American Nat'l Bank & Trust Co.*, 865 S.W.2d 302 (Ky. 1993) where Justice Leibson wrote: "The idea that any person or industry or enterprise would be immune from liability for fraud and deceit is not acceptable." This quote was cited by Judge Heyburn in *Davis, supra*, and it should be further noted that Judge Heyburn's decision in *Davis, supra*, was affirmed by the Sixth Circuit at 279 Fed.Appx. 378 (6th Cir., 2008) and *certiorari was denied* by the U.S. Supreme Court at 555 U.S. 171 (2009).

## COUNT V

## PROMISSORY ESTOPPEL
### as against
### Defendants, Mr. Schroering and LEED

74.     The allegations contained in paragraphs 1 through 73 are incorporated as if fully set forth in this Count V.

75.     Following their breach of the contract on October 5, 2012, to purchase the Plaintiffs' interests in 70% of the assets of Trinity/Delaware, which totaled 6,528,682 shares of GEE common stock, the Defendant Mr. Schroering individually and in his capacity as the organizer and manager of LEED made repeated oral promises and assurances (virtually every week following October 5, 2012 to the day of the filing of this litigation) to the Plaintiffs, Derby Capital and Derby JOB that he either individually or through LEED would advance sufficient money to purchase the interests of the Plaintiff in Trinity/Delaware.

76.     The Defendants Mr. Schroering, individually and in his capacity as the organizer and manager of LEED reasonably expected that their assurances and promises would induce the Plantiffs to rely on said assurances and promises and forego the filing of any litigation to secure and protect their rights.

77.     The Plaintiffs reasonably relied on said assurances and promises to their detriment by waiting several months for the said Defendants to honor their contracts and assurances.

78.     As a direct and proximate result of the Defendants' Mr. Simmons, Mr. Schroering and Mr. Wagonseller's assurances and promises, and the Plaintiffs' reasonable reliance thereon, and the failure of the Defendants Simmons and Schroering to fulfill their promises and meet their obligations to the Plaintiffs, the Plaintiffs have suffered damages including in an amount to be

determined at a trial of this case and an amount to be determined at trial for additional costs, expenses and losses as a result of the Defendant Mr. Schroering's assurances and promises.

## COUNT VI

### EQUITABLE ESTOPPEL
### as against
### Defendants Trinity/Delaware, Mr. and Mrs. Simmons,
### Mr. Schroering and LEED

79.     The allegations contained in paragraphs 1 through 78 are incorporated as if fully set forth in this Count VI.

80.     The Defendants Mr. Simmons, individually and in his capacity as a minority partner in Trinity and Mr. Schroering, individually and in his capacity as the organizer and manager of LEED exhibited conduct, including acts, language and silence that amounted to a representation and/or concealment of material facts of which it was aware and of which the Plaintiffs were not aware.

81.     Among those facts were that were effectively concealed was the total and complete involvement of one Anthony Huff in the activities of the Defendants Mr. Simmons and Mr. Schroering. In the initial stages of the working business relationship between the Plaintiffs and Trinity, the Plaintiffs were aware of that Mr. Huff was a 'consultant' to his son-in-law, Mr. Simmons, but were continuously led to believe that Mr. Simmons made the ultimate decisions regarding his participation in the operations of Trinity.  Furthermore, the Plaintiffs were satisfied that Mr. Simmons was fully aware of the operation of Trinity and was a competent minority partner.

82.     To further this effort to assure itself of an arms-length transaction with Mr. Simmons that did not involve Mr. Huff, the Plaintiffs even went to the efforts of requesting an interview with Mrs. Simmons, Mr. Huff's daughter, for the purposes of gaining assurances that

Mrs. Simmons was an active and knowing participant with her husband in the operation of Trinity.

83.     The Defendants, Mr and Mrs. Simmons acted with the full intention and/or expectation that the Plaintiffs would continue the working relationship with Trinity and would act upon the favorable conduct of Mr. and Mrs. Simmons.

84.     The Plaintiffs did, in fact, rely upon Mr. and Mrs. Simmons' conduct to its detriment.

85.     As a direct and proximate result of Mr. and Mrs. Simmons' conduct, the Plaintiffs' reasonable reliance thereon, and the failure of Mr. and Mrs. Simmons to meet their obligations to the Plaintiffs, the Plaintiffs have suffered damages in an amount to be determined at trial and in a further mount to be determined at trial for additional costs, expenses and losses incurred as a result of Mr. and Mrs. Simmons' conduct.

## COUNT VII

### MULTIPLE VIOLATIONS OF
### RACKETER INFLUECED AND CORRUPT ORGANIZATION ACT
### as against
### Defendants Mr. Schroering, LEED, Mr.  and Mrs. Simmons, Trinity/Delaware
### and
### Mr. Wagonseller

86.     The allegations contained in paragraphs 1 through 85 are incorporated as if fully set forth in this Count VII.

87.     The actions and inactions of the Defendants Mr. Simmons and Mrs. Simmons, individually and on behalf of Trinity/Delaware and Trinity/Kentucky; Mr. Schroering, individually and on behalf of LEED and Mr. Wagonseller, whose conduct aided and abetted the activities and actions of both Mr and Mrs. Simmons and Mr. Schroering resulted in violations of 18 U.S.C. §1341, 1343, and 1962(c).

88.     LEED and Trinity as misued by Mr. and Mrs. Simmons and Mr. Schroering is an enterprise as defined by 18 U.S.C. §1962(4).

89.     LEED and Trinity, as misused by Mr. and Mrs. Simmons and Mr. Schroering, are enterprises which affect commerce at all times relevant hereto.

90.     Mr. and Mrs. Simmons, Mr. Schroering and Mr. Wagonseller participated in the conduct of the enterprises' affairs as they related to the deliberate, intentional and knowing purloining of the Plaintiff's rightful ownership interest in the assets of Trinity/Delaware, which included the aforementioned shares of GEE common stock.

91.     Mr. Simmons, Mr. Schroering and Mr. Wagonseller further attempted to fraudulently induce numerous individuals to invest in LEED and or loan it money or fund it in a manner to allow it to purchase the Plaintiffs' interest in Trinity/Delaware, after filing false and misleading 13D EDGAR Statements with the SEC which they utilized to cause these putative investors to believe that they owned controlling shares of GEE through the false acquisition of the Plaintiffs' interests.

92.     These efforts described above included but are not limited to trips to New York City and Chicago to meet with financial entities – at which time, they were joined by Mr. Huff. The purpose of these meetings was to secure financing to purchase the Plaintiffs' interest in Trinity/Delaware – all the while proclaiming to the world through their false 13D EDGAR SEC filings that they already owned said interests.

93.     As a direct and proximate cause of the Defendants, Mr. Simmons, Mr. Schroering and Mr. Wagonseller's fraudulent actions, misrepresentations and activities, they caused the value of the GEE securities to substantially damaged between the period of time of the false and misleading 13D EDGAR filings and the filing of this lawsuit, resulting in damages to the

Plaintiffs, which were unnecessary had the said Defendants not committed the aforesaid fraudulent actions, in an amount to be determined at the trial of this case.

94.     Furthermore, as a direct and proximate cause of the Defendants, Mr. Simmons, Mr. Schroering and Mr. Wagonseller's fraudulent actions, misrepresentations and activities they have caused other damages to the Plaintiffs which were unnecessary had they not committed the aforesaid fraudulent actions not occurred, in an amount to be determined at the trial of this case.

95.     In addition to these damages the Plaintiffs are entitled to treble damages and reasonable attorneys' fees, pursuant to 18 U.S.C. §1964.

**COUNT VIII**

**MULTIPLE VIOLATIONS OF**
**17 CFR §240.10(B)(5)**
**PROVIDING A PRIVATE RIGHT OF ACTION**
**PURSUANT TO**
***JANUS CAPITAL GROUP V. FIRST DERIVATIVE TRADERS***
**131 S.CT. 2296 (June 13, 2011)**
**as against**
**Mr. Schroering and Mr. Wagonseller**

96.     The allegations contained in paragraphs 1 through 95 are incorporated as if fully set forth in this Count VIII.

97.     The United States Supreme Court in the recent case of *Janis Capital Group, supra,* has re-affirmed the concept of a 'private right of action' under 17 CFR §240.10(b)(5) [hereinafter 10(b)(5)] when the facts presented establish: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

98.     The allegations and facts contained in the previous paragraphs 1-95 establish all six (6) of the criteria required in *Janus Capital, supra.* have been committed by the Defendants

Mr. Schroering, and/or Mr. Wagonseller.

99.     Furthermore, in accordance with the U.S. Supreme Court's Opinion in *Janus Group, supra*, the 'ultimate authority' and the control persons for the fraudulent and deliberately incorrect EDGAR filings involved in this case, beginning in August of 2012, were the Defendant, Mr. Schroering, because he was directly involved in creating the documents and signed the false documents that were subsequently filed in EDGAR filings by the Defendant Mr. Wagonseller – who knew beyond a shadow of doubt that the EDGAR statements he filed were not truthful, because both he and Mr. Schroering knew that Mr. Schroering and LEED did not own the shares of stock that they asserted in the filings, because Mr. Schroering had not paid for them – and still, to the day of the filing of this pleading – has not paid for them.

100.     In its holding in *Janus Group, supra*, the Court fashioned the following rule: "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."

101.     Therefore, the Plaintiffs are entitled to recover the damages they have suffered in a private action under 10(b)(5) as against said Defendants, in an amount as established in a trial by jury of this case.

**WHEREFORE,** the Plaintiffs pray for:

1.     A judgment in their favor on each of the above and foregoing eight (8) counts or any of them; and for

2.     A trial by jury of this cause of action; and for

3.     Their costs herein expended; and for

4.     Their attorneys' fees where entitled; and for

5.     Any and all other relief to which they may be properly entitled.

Respectfully submitted,


J. Bruce Miller
Norma C. Miller
**J. BRUCE MILLER LAW GROUP**
Waterfront Plaza, 20th Floor
325 W. Main Street
Louisville, Kentucky 40202
Office Ph. 502-587-0900
Office Fx. 502-587-7756
*Counsel for the Plaintiffs*

December 21, 2012

## VERIFICATION

I, Jeffrey A. Moody, a member of Derby Capital, state that I have read the above and foregoing Verified Complaint and aver under my solemn oath that the statements contained therein are true to the best of my knowledge and belief.

_Jeffrey Alan Moody_
Jeffrey Alan Moody

Subscribed and sworn to before me by Jeffrey Alan Moody on this the 20th day of December 2012.

COMMONWEALTH OF KENTUCKY )
                                               )
COUNTY OF JEFFERSON )

_____
Notary Public, Kentucky State at Large

My Commission Expires: 5-10-2015

## VERIFICATION

I, J. Sherman Henderson, a member of Derby Capital, state that I have read the above and foregoing Verified Complaint and aver under my solemn oath that the statements contained therein are true to the best of my knowledge and belief.

_J. Sherman Henderson_
J. Sherman Henderson

Subscribed and sworn to before me by J. Sherman Henderson on this the 20th day of December 2012.

COMMONWEALTH OF KENTUCKY )
                                               )
COUNTY OF JEFFERSON )

_____
Notary Public, Kentucky State at Large

My Commission Expires: 5-10-2015