## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | | |
|---|---|---|
| DERBY CAPITAL, LLC, *et al* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No. 3:12-CV-000850-TBR |
| | ) | |
| TRINITY HR SERVICES, LLC, et al | ) | |
| | ) | |
| Defendants | ) | |

### DEFENDANT JUDSON WAGENSELLER, TIFFANY SIMMONS, BRANDON SIMMONS, TRINITY HR SERVICES, LLC, AND TRINITY HR, LLC MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR FAILURE TO STATE A CLAIM AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Judson Wagenseller, Tiffany Simmons, Brandon Simmons, Trinity HR, LLC ("Trinity/Kentucky"), and Trinity HR Services, LLC ("Trinity/Delaware") ("Movants") respectfully move this Court for an order dismissing Plaintiffs Derby Capital, LLC's and Derby Capital JOB, LLC's Verified First Amended Complaint (the "AC") as against Movants. In an unmitigated display of shotgun (and in too many places loose cannon) pleading, Plaintiffs attempt to convert a simple breach of contract claim against one entity into a tsunami of tort claims, none of which has been adequately pled, notwithstanding the many weeks Plaintiffs had to go to school on Movants' initial motion to dismiss. All Plaintiffs have done in their Amended Complaint is (i) add more irrelevant "background", (ii) dump more defendants into the captions of more Counts, often without even bothering to allege why they should be included, and (iii) add a demonstrably bogus claim against General Employment Enterprises, Inc.

In summary, Plaintiffs make the following claims, which are doomed for the following reasons (among many others):

1. <u>Breach of the Old Contract</u>— no breach alleged, and none of the Defendants were parties to it, other than Trinity/Delaware.

2. <u>Breach of the New Contract</u>— none of the Defendants were parties to it, other than Trinity/Delaware.

3. <u>Fraud Inducement[sic]</u>— cannot claim reliance on implied promise to pay and at the same time admit they knew the GEE shares were Trinity/Delaware's sole asset.

4. <u>Promissory Estoppel</u>— as a matter of law cannot advance this claim when the promise is with respect to a matter covered by a contract.

5. <u>Equitable Estoppel</u>— as a matter of law cannot advance this claim in the absence of anything to be estopped.

6. <u>Common Law Fraud</u>— none alleged.

7. <u>Civil Conspiracy</u>— none alleged.

8. <u>Civil RICO</u>— still fail to adequately plead ***any*** elements of a RICO claim.

9. <u>Federal Securities Fraud</u>— none alleged, esp. no misrepresentation in connection with a securities sale and no loss causation.

10. <u>Negligence</u>— No jurisdiction.  Misjoinder.  GEE owes no duty to non-shareholders.

## I.     BACKGROUND

Plaintiffs are two limited liability companies formed by Bruce Miller, Jeff Moody, Sherm Henderson and others in 2011 to "provide merchant banking services and management and consulting services to early stage and distressed operating companies and real estate developments." Derby held itself out as being comprised of members "with a wide variety of skills and expertise", including "CEO's and real estate financiers as well as a C-level banker and highly regarded attorney." In the AC they are characterized as "a group of highly successful businessmen" for the purpose of pursuing business opportunities across America."

Derby's members parked themselves on the floor below Anthony Huff's office in October 2011, and, unable to generate sustainable deal flow on their own, looked for Huff to generate business for them. The deal subject of the AC is one of them.   A letter of intent was signed in November 2011 contemplating a sale by Trinity/Delaware to Derby of PSQ, LLC, the original holder of a controlling shareholder interest in General Employment Enterprises, Inc., a Chicago based publicly traded staffing company.  This was supplanted in January 2012 with a letter of intent contemplating the issuance by Trinity/Delaware to Derby JOB of a 70% membership interest in Trinity/Delaware.  Then in March 2012 the parties rushed into and executed an Interest Purchase Agreement (the "Old Contract"), which went down the road of consummating a purchase and sale, but which did not actually *effect* a purchase and sale because (i) the Class A membership interests to be sold to Derby/Job had yet to be created, and (ii) various closing conditions had to be effected, in particular with respect to a highly problematical loan Derby had gotten to finance their purchase (see untitled agreement included in Exhibit 17 to the AC).  (Notably, if Derby's representatives *really* thought Derby had purchased a majority

ownership interest in Trinity/Delaware at any time, why did they fail to make required SEC filings related to that ownership???)

Immediately after the IPA was entered into, Jud, Trinity/Delaware's legal counsel, prepared the required amendment to Trinity/Delaware's operating agreement to consummate the transaction and forwarded it to Moody (on March 30), Derby's point man on the deal.  Moody didn't respond until May 7, admitting that it had been put on the "back burner" while Derby engaged in further due diligence.  Jud reminded Moody on May 9 that the side letter closing conditions had yet to be satisfied.  And that would be the end of it.  Derby never took actions required to consummate the deal, including finalizing the operating agreement or satisfying the closing conditions.  Why?  Because Derby probably realized that, notwithstanding its members' purported "skills and expertise" and "nationwide business connections and acquaintances capable of funding and financing an exponential growth of GEE", they didn't have what it took to create enough value in GEE in order to be able to pay off the $1,260,000 delayed purchase price installment due in December 2013.  Instead they opted to attempt to find an investor so Derby could take their modest out-of-pocket investment off the table.  (See two such proposals attached as Exhibits A and B.)  When the Trinity/LEED transaction was finally effected, more than four months after the Trinity/Derby unconsummated transaction, Trinity agreed to purchase Derby's inchoate purposely undefined "interest" in Trinity for $750,000, yielding Derby a 100%+ return on the $235,000 of its own money it had invested in the deal for less than a year. In short, Derby opted to take a quick $265,000 profit rather than risk a $500,000 loss due to their ever increasingly evident prospective inability to enhance GEE share value.  (Notwithstanding Derby's recitation in the AC of GEE deals they had teed up and their capacity to increase GEE share value "exponentially"—the fact is they never closed a single deal, for GEE or, to Movants'

4

knowledge, anyone else in the entire year they were in business, and in fact had  concerns about their ability to even hold a productive meeting, let alone cut deals across the country.  (See Exhibit C—an internal evaluation authored by Moody concerning Derby's many "challenges").  Derby apparently cratered as a functioning enterprise within a year of its birth.

Ultimately, the only possibly viable claim in the Amended Complaint is Derby Job's claim against Trinity/Delaware for breach of contract, which will be subject to various counterclaims by Trinity, including for fraud in the inducement relating to Derby and certain members' misrepresented employment history and financial wherewithal.


## II. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM.

### A.      Legal Standard.

Under FRCP 8(a)(2) a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  In addition, Federal Rule of Civil Procedure 9(b) provides that "the circumstances constituting fraud or mistake shall be stated with particularity." To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory.  Nonetheless, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.  *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005);  *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir. 1993). Pleadings based on mere conclusions of fact and law are also legally insufficient.  *Place v. Shepherd*, 446 F.2d 1239, 1244 (6th Cir. 1971).  "A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the complaint's framework, they must be

5

supported by factual allegations." *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009).  The allegations of the complaint "must be enough to raise a right to relief above the speculative level" and state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, (2007).  S*ee also,  Ass'n of Cleveland Firefighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).  "Determining whether a complaint states a plausible claim for relief will"  be a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, supra,* at 1949.

In addition, under Rule 9(b) Plaintiffs have an even higher pleading standard in all allegations of fraudulent conduct.  The Sixth Circuit has held that this requires a plaintiff to plead, at a minimum, "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-162 (6th Cir. 1993) (quoting *Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1385 (W.D. Mich. 1992)).  The complaint must "(1) specify the statements that the plaintiff contends that were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008).  Federal courts have repeatedly emphasized that "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant"  and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG*, 476 F.3d 756, 765 (9th Cir. 2007)(internal citation omitted).  "The heightened pleading standard is also designed to prevent "fishing expeditions", to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters." *Chesbrough v. VPA, P.C.* 655 F.3d

461, at 467 (6th Cir. 2011), citing *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.* 501 F.3d 493, 503 (6th Cir. 2007).

     **B.**    **Argument.**

     Defendants responses to Plaintiffs' claims are as follows.

     1.    <u>**Count I--Breach of Express/Implied Contract**</u>. [Trinity/Delaware, Trinity/Kentucky, Tiffany, Brandon, Jud]   Here Plaintiffs allege they enjoyed a contract with Trinity/Delaware to purchase a 70% membership interest in Trinity/Delaware, i.e. the Old Contract.  Then in ¶72 they allege that Movants took actions described in ¶¶ 43-50 "to breach this contractual understanding" – Plaintiffs' claim fails for a variety of reasons.  First, other than Trinity/Delaware, Movants were not parties to the Old Contract, so they can't have breached it.  Second, Plaintiffs fail to allege how it was breached, let alone breached by each Movant.   Third, as to their claim in ¶73 that Jud was an "aider and abettor" of the unidentified breach, Movants have found no reported Kentucky case discussing a cause of action for "aiding" or "abetting" a breach of contract (and Plaintiffs, very eager to cite authority for all their other claims rather than simply state them in accordance with Rule 8(a)(2), haven't cited any authority laying out the elements of an aiding and abetting breach of contract claim).  Accordingly, Plaintiffs' Count I should be dismissed.

     2.    <u>**Count II--Breach of Contract**</u>. [Trinity/Delaware, Trinity/Kentucky, Tiffany, Brandon, Jud].  Here Plaintiffs allege that Movants "entered into written contracts, promises and assurances to the Plaintiffs, Derby Capital and Derby JOB, that they would purchase the 70% interest of the Plaintiff in Trinity/Delaware for the sum of $750,000" (the "New Contract").  ¶75.  Plaintiff is apparently referring to the contract attached as <u>Exhibit</u> 17 to the AC.  Then in ¶77 Plaintiffs allege that Movants "breached these written contracts by failing to purchase the

Plaintiffs' interests as committed by their written promises and assurances." This claim fails as to all Movants other than Trinity/Delaware for the obvious reason that they are not parties to the New Contract.  To the extent Plaintiffs are referring to some unidentified oral agreement, such a claim must fail due to the statute of frauds--KRS 371.010(7) [contracts not to be performed within one year] and/or KRS 371.010(4) [agreements to answer for the debt of another].  The aiding and abetting claim alleged against Jud in this Count fails for the same reason it fails in Count I.  Finally, Plaintiffs included Trinity/Kentucky in the Count II caption but nowhere allege Trinity/Kentucky breached the New Contract.

For the forgoing reasons, Plaintiffs' Count II claim should be dismissed as to all Defendants other than Trinity/Delaware, the only Defendant which was actually a party to the New Contract.

3.    **Count III—Fraud Inducement [sic]**. [Trinity/Delaware, Trinity/Kentucky, Tiffany, Brandon, Jud].  Here Plaintiffs claim that Tiffany, Brandon, Trinity/Delaware and Trinity/Kentucky "never had any intention of paying, in accordance with their contractual commitments, for the Plaintiffs [sic] interests in Trinity/Delaware…", alleging as proof that none of them had the funds available to meet that commitment.

In order to prevail on a fraud claim Plaintiffs must establish six elements by *clear and convincing* evidence:  (i) material misrepresentation, (ii) which is false, (iii) known to be false or made recklessly, (iv) made with inducement to be acted upon, (v) acted in reliance thereon, and (vi) which causes injury.  *United Parcel Service Co. v. Rickert,* 996 S.W.2d 464, 468 (Ky. 1999), and *Wahba v. Don Corlett Motors, Inc.,* 573 S.W.2d  357, 359 (Ky. App. 1978).  Where the proven facts or circumstances merely show inferences, conjecture, or suspicion, or such as to leave reasonably prudent minds in doubt, it must be regarded as a failure of proof to establish

8

fraud. *Goerter v. Shapiro*, 254 Ky. 701, 72 S.W.2d 444 (1934).  Similarly, õ[t]he very essence of actionable fraud or deceit is the belief in and reliance upon the statements of the party who seeks to perpetrate the fraud.  Where the plaintiff does not believe the statements-or where he has knowledge to the contrary-recovery is denied.ö *Wilson v. Henry*, 340 S.W.2d 449, Ky. 1960 (internal citations omitted).

Since Plaintiffs have failed to allege any misrepresentations in connection with the formation of the New Contract, and certainly none which satisfy Rule 9(b), Movants can only infer that Plaintiffs mean to allege that merely by virtue of Trinity/Delaware entering into the New Contract at a time when Trinity/Delaware had insufficient funds on hand to meet its prospective payment obligations, this yields fraud in the inducement.

To the extent the only Defendants involved in executing the New Contract are Trinity/Delaware and Brandon, this claim fails as to Trinity/Kentucky, Tiffany and Jud.

Plaintiffsøclaim is further utterly decimated by Plaintiffsørepeated (correct) allegation that Trinity/Delawareøs sole asset was the GEE stock sold to LEED.  See AC p.5 (twice) and ¶¶42, 56, 69 and 112.  Plaintiffs knew perfectly well that with the sale, Trinity/Delaware had no other assets with which to pay Plaintiffs.  This claim is further directly contradicted by Trinity/Delawareøs pledge to Derby of the $721,000 payment owed it by LEED at the same time as Trinity/Delaware owed Derby its payments.  Plaintiffs admit this claim destroying allegation in ¶51(a) (referencing the Pledge Agreement from Trinity/Delaware to Derby Job included as Appendix 18 to the Amended Complaint) and the requirement in the Pledge Agreement that LEED make the payment due thereunder ***directly*** to Derby Job (see Section 2 of the Pledge Agreement).  Movants also note Plaintiffsøallegation in ¶122 that the Defendants attempted to õinduce numerous individuals to invest in LEED and or loan it money or fund it in a manner to

**allow it to purchase Plaintiffs' [sic] interest in Trinity/Delaware** " [emphasis added].  If there was no intent to pay them, why would they have been out trying to raise money to… pay them?  Plaintiffs further note in their "Executive Summary" [middle of p.5] that Plaintiffs were "long-time friends and acquaintances" of Schroering, the "organizer and manager" of LEED (¶¶9, 87).

Plaintiffs include Jud in the Count III caption, but fail to make any allegations against him as to this Count.

From the foregoing it's obvious that Plaintiffs were fully aware that Trinity/Delaware did not have the funds to pay Derby, but that payment was to be made from funds coming directly from LEED in respect of *its* payment obligations to Trinity/Delaware.  Accordingly, Plaintiffs are foreclosed from asserting they reasonably relied on a "misrepresentation" related to the mere execution of the New Contract to their detriment.  And what, exactly, was Movants' "fraudulent scheme"?  To just not pay Derby?  Plaintiffs may enjoy a breach of contract claim against Trinity/Delaware, but their fraud claim is simply implausible and should be dismissed.

4.    **Count IV—Promissory Estoppel** [Jud].  Here Plaintiffs allege that Jud "made repeated oral promises and assurances (virtually every week following October 5, 2012 to the day of the filing of this litigation) to the Plaintiffs… ..that Mr. Schroering… .would advance sufficient money to purchase the interests of the Plaintiff in Trinity/Delaware."  Promissory estoppel involves "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance [and it] is binding if injustice can be avoided only by enforcement of the promise." *Sawyer v. Mills,* 295 S.W. 3d 79, 89 (Ky. 2009).

Plaintiffs have an insurmountable problem as regards this claim, aside from the fact that it's a bald-faced lie.  Under well-settled Kentucky law estoppel cannot be the basis for a claim if it represents the same performance contemplated under a written agreement." *Tractor and Farm Supply, Inc. v. Ford New Holland, Inc.* 898 F. Supp. 1198, 1206 (W.D. Ky 1995).   "[I]t is a widely accepted principle that promissory estoppel is applicable only in the absence of an otherwise enforceable contract[.]" *Shane v. Bunzl Distrib. USA, Inc.* 200 F. App'x 397 (WD Ky 2001), quoting *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 934 (8th Cir. 1999) (predicting that the Kentucky Supreme Court would adopt this principle).  *See*, *also, Gonzalez v. Imaging Advantage, LLC,*  2011 WL 6092469, at *(W.D. Ky. Dec. 7, 2011)(dismissing promissory estoppel claim due to presence of written contract) and *Owensboro Mercy Health System, Inc v. Willis North America, Inc.* 2009 WL 1405172 (WD Ky, May 18, 2009).

Plaintiffs have asserted a breach of contract claim in Count II with respect to the New Contract, which is the contract they claim here Jud promised them they would get paid for.

As such, Plaintiffs' promissory estoppel claim fails as a matter of law, and it must be dismissed.

5. **Count V—Equitable Estoppel** [Trinity/Delaware, Trinity/Kentucky, Tiffany, Brandon, Jud]   This Count is largely incoherent.  "Equitable estoppel is a defensive doctrine founded on the principles of fraud, under which one party is prevented from taking advantage of another party whom it has falsely induced to act in some injurious our [sic] detrimental way." *Ping v. Beverley Enterprises, Inc.* 376 S.W.3d 581, 594-595 (Ky. 2012).  "The doctrine of equitable estoppel is predicated upon the theory that [w]here one has, by a course of conduct, with full knowledge of the facts with reference to a particular right or title, induced another, in reliance upon such course of conduct, to act to his detriment, he will not thereafter be permitted

11

in equity to assume a position or assert a title inconsistent with such course of conduct, and if he does he will be estopped to thus advantage of his own wrong." *S.R.D. v. T.L.B.* 174 S.W.3d 502, 506 (Ky. App. 2005) citing *Farmer v. Gipson*, 201 Ky. 477, 257 S.W. 1, 2 (Ky. 1923).

Plaintiffs make a single allegation in this Count– that "the total and complete involvement of one Anthony Huff in the activities of the Defendants Mr. Simmons and Mr. Schroering" was concealed from them.  There are a host of problems with this claim.  First, they fail to identify who concealed this, and how they relied on that concealment to their detriment and, most importantly, what "position" any Movant should be estopped from asserting as a result of such concealment.  In particular, given that Trinity/Delaware had no operations whatsoever--it was merely a holding company for GEE shares (admitted by Plaintiffs in ¶¶ 42, 69 and 112), it's difficult to see how any Huff involvement would have possibly been material.   Further, Plaintiffs make no allegations in this Count as to Trinity/Delaware or Trinity/Kentucky.  Further, they make no allegations as to Jud– newly added to this claim– other than to state that he "engaged in each of the actions set forth in this Count, in his capacity as counsel to [the Defendants]."  If Plaintiffs are asserting Jud should have apprised them of some information about Huff or Huff's activities with respect to Trinity/Delaware or Trinity/Kentucky, they need to refresh their recollection of SCR 3.130(1.6), which prohibits the communication of information relating to client representation, i.e. all information learned by an attorney from having represented a client, privileged or not privileged, and oft-times including knowledge that is available to the public.  (The fact that Plaintiffs were more than on notice as to Huff's legal issues is explored in Section IV, Par. 2, below.)

Accordingly, this Count should be dismissed for failure to state a claim.

6.      **Count VI—Common Law Fraud** [Trinity/Delaware, Trinity/Kentucky, Tiffany, Brandon, Jud]    Plaintiffs return to their shotgun pleading methods in this Count, by merely incorporating paragraphs 1-97, followed by two pages of conclusions.  Other than the fraud in the inducement claim dealt with in Count III, Plaintiffs fail to assert a fraud claim, let alone one that satisfies the pleading requirements of Rule 9(b) or gives Movants fair notice of what that claim is.   Accordingly, this claim should be dismissed.

7.      **Count VII—Civil Conspiracy** [Trinity/Delaware, Trinity/Kentucky, Tiffany, Brandon, Jud]   Plaintiffs continue their shotgun pleading methods in this claim, wherein they, again, merely incorporate 103 prior paragraphs, followed by a page of meaningless legal conclusions.  In particular, they fail to allege what was being conspired about or allege any facts indicating a conspiracy.  Finally, to the extent none of the causes of action claimed in the Amended Complaint are viable, the claim of a conspiracy as to any such causes of action must also fail.

8.      **Count VIII—Civil RICO**    [Trinity/Delaware, Trinity/Kentucky, Tiffany, Brandon, Jud]    Plaintiffs' amended RICO claim has gone from being largely incoherent to being completely incoherent, and continues to reveal Plaintiffs' lack of understanding of civil RICO, securities and basic business law.  The primary changes to their revised RICO count are to add a "non-defendant" [sic] as a "defendant", namely "Non-defendant, W. Anthony Huff a/k/a —The Huff Enterprise" and to invoke seven uses of the phrase "wire and mail fraud" without ever citing an actual wire or mail fraud predicate act.

18 USC §1964(c) provides a private right of action to "any person injured in his business or property by reason of a violation of §1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

13

interstate or foreign commerce, to conduct or participate‖ in the conduct of such enterprisesø affairs through a pattern of racketeering activityö. The Sixth Circuit has stated that to state a RICO claim plaintiffs must plead the following elements:  (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Moon v. Harrison Piping Supply,* 465 F.3d 719, 723 (6th Cir. 2006).

Plaintiffs have failed to adequately allege the elements required to advance a RICO claim, as follows.

(a)     No õenterpriseö.   Plaintiffsø description of the RICO enterprise has gone from faintly arguable to completely confused.   First, they allege in ¶109 the existence of ÷õThe Huff Enterpriseö in the form of a subterranean conspiracy to defraud individuals and entities all over Americaí .ø  This is followed in ¶113 by a claim that õthe RICO Defendants and Mr. Hufføs very life itself (a/k/a õThe Huff Enterprisesö) as operated by the non-defendant Mr. Huff were an ÷enterpriseø as that term is defined in 18 U.S.C. §1961(4) and as used in §1962. *Each* was created and existed as an entity engaged in or affecting interstate commerce apart from the pattern of racketeering activity alleged in this First Amended and Verified Complaint. [emphasis added]ö  Movants have no idea what this means. *Each* what?

Then in ¶116 Plaintiffs allege õEach of the RICO Defendants was associated with and/or employed by each other and by the Huff Enterprises and conspired to and did, as a part of that employment or association, to [sic] conduct or participate in the conduct of the affairs of their respective enterprises thereby engaging in a pattern of racketeering activity.ö  Movants have no idea what this means.

Then in ¶117 Plaintiffs allege that Jud and Huff and Hufføs õHuff Enterprisesö õoperated together through a pattern of racketeering activity, that took place over a period of years and

included multiple acts of mail and wire fraud that when known to their fullest extent will boggle the mind of any decent and law-abiding American citizen.ö  *Really*?

Then in ¶119 Plaintiffs allege that õLEED and Trinity/Delaware and Trinity/Kentucky as used and misused by Mr. and Mrs. Simmons and Mr. Schroering each operated in that capacity as an enterprise as defined by 18 U.S.C. §1962(4).ö  Here Plaintiffs appear to be alleging that *each* entity Defendant is also a RICO enterprise.  That, of course, is not possible.  18 U.S.C. 1962(c)  makes it õunlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.ö  In other words, an entity RICO enterprise cannot also be a RICO defendant, associating with *itself*.  ÷It is plain that the language of this subsection precludes the "person" conducting or participating in an enterprise's affairs from simultaneously serving as the "enterprise."ø  *Puckett v. Tennessee Eastman Company*, 889 F.2d 1481, 1489 (6th Cir. 1989).

Since Plaintiffs have alleged that *all* the Defendants in this case, including the entity Defendants, are RICO defendants, the only õassociationö that can be alleged as a RICO enterprise is an association-in-fact enterprise comprised of all the Defendants, plus Huff.  The Sixth Circuit has held that a RICO enterprise must have (i) an ongoing organization, with some sort of framework or superstructure for making and carrying out decisions; (ii) that the members of the enterprise functioned as a continuing unit with established duties; and (iii) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged.  *United States v. Chance*, 306 F.3d 356, 372 (6th Cir. 2002).  With respect to õassociation-in-factö

15

RICO enterprises, the U.S. Supreme Court has stated that õan association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterpriseøs purpose.ö *Boyle v. United States,* 556 U.S. 938, at 946 (2009).  The Plaintiff must show õa continuing unit that functions with a common purpose.ö  *Id* at 949. The Sixth Circuit has further stated that an association-in-fact enterprise õrequire[s] a certain amount of organizational structure which eliminates simple conspiracies from the Actøs reach.ö  *VanDenBroeck v. CommonPoint Mortg. Co.,* 210 F.3d 696, 699 (6th Cir. 2000).

Plaintiffs fail to allege facts supporting The Huff Enterprise[s] is a RICO enterprise. Aside from gross generalities and conclusions masquerading as facts, they fail to allege requisite illegal purposes, structure, relationships, separate activity or longevity.

(b)      No nexus with õinterstate commerceö.  Plaintiffs have failed to identify how the Huff Enterprise, comprised of *all* (or even *some*) of the RICO Defendants, was engaged in interstate commerce, or activities affecting interstate commerce.

(c)      No õracketeering activityö or õconductö.  Plaintiffs fail to identify and allege RICO predicate acts conducted through the Huff Enterprise.  They utter the magic words õwire fraudö and õmail fraudö, and repeatedly generally allege such acts, but completely fail to specify what those predicate acts are, or even remotely satisfy the FRCP 9(b) pleading requirements, or tie them to the Huff Enterprise, or tie them to Movants, or tie them to a Plaintiff cause of action. As to mail fraud (18 U.S.C. § 1341) the elements are (i) a scheme to defraud, and (ii) the mailing of a letter, etc., for the purpose of executing the scheme.  *U.S. v. Martinez* 588 F.3d 301, 316 (6th Cir. 2009).  The elements for wire fraud ( 18 U.S.C. § 1341) are  (i) a scheme or artifice to defraud, (ii) use of interstate wire communications in furtherance of the scheme, and (iii) intent

to deprive a victim of money or property.  *Id* at 316.  In order to satisfy the FRCP 9(b) pleading requirements Plaintiffs must allege the date, method of delivery, sender and recipient, the contents of each false representation, and what was obtained or given up in reliance.  *Blount Financial Service, Inc. v. Walter E. Heller & co.* 819 F.2d 151 (6th Cir. 1987).  Plaintiffs have failed to allege any predicate act of mail or wire fraud.  They do allege some other acts in more detail that they claim are wrongful, but neither satisfies RICO pleading requirements, and most importantly, they don't allege that the Huff Enterprise was the perpetrator.  (See 18 USC 1961(1)).  First is that their ownership interest in the assets of Trinity/Delaware was "purloined" by Brandon, Tiffany, Mr. Schroering and Jud.  Second is that Brandon, Jud and Mr. Schroering attempted to defraud potential investors in or lenders to LEED by filing a false Form 13D.

As to the first, under KRS 275.240(1) members in a limited liability company do not enjoy *any* ownership rights in company property.  Even if the Trinity/Derby JOB transaction had ever been consummated, Derby JOB would not have enjoyed ownership rights in the GEE shares, and therefore cannot complain of any interest in GEE shares being "purloined."  (As is obvious from Appendix 14--the Interest Purchase Agreement at Section 1.1 and the untitled side letter at Par. 2—Plaintiffs merely enjoyed an executory contract to purchase Series A membership units in Trinity/Delaware, and Derby JOB would not become a member until the Trinity/Delaware amended and restated operating agreement was drafted, agreed to and executed.  As Plaintiffs acknowledge in ¶43, this never happened and as a result Derby JOB never enjoyed either a direct or indirect interest in the GEE shares.)  All that happened here was that Trinity management exercised its authority to sell the GEE shares to LEED.  One way or the other, Plaintiffs have failed to identify what RICO predicate offense "purloinment" violates, and

have failed to allege that the RICO enterprise—the Huff Enterprise—committed the act complained of.

Second relates to Plaintiffs' claim that certain RICO Defendants (but not the RICO enterprise) *attempted* to defraud potential investors into investing in LEED so LEED could buy Derby JOB's prospective interest in Trinity.  The problems with this are manifold.  First, they have not alleged the Huff Enterprise committed this act.  Second, to the extent Plaintiffs have not articulated what the RICO Enterprise purpose was, it cannot be alleged it was a purpose of the Huff Enterprise.  Third, Plaintiffs fail to remotely satisfy the Section 9(b) pleading requirements for fraud, and securities fraud is not even a RICO predicate.  Fourth, Plaintiffs' assertion that LEED's 13D was false because LEED did not actually own the GEE shares before it fully paid for them is logically and facially ludicrous.  Securities & Exchange Commission rules require disclosure of *beneficial ownership* of the subject shares—it's irrelevant whether they are *fully* paid.  See 17 CFR 240.13d-3.  Further, failure to have fully paid for property is meaningless in the context of ownership, as anyone who has ever owned a house with a mortgage knows.  Finally, Plaintiffs' complaint here is highly disingenuous . . . .Moody and Henderson owned *no* GEE shares and yet they properly filed Forms 13D as to their beneficial ownership of the Trinity GEE shares.

(d)    No "pattern".  Plaintiffs have failed to allege a "pattern of racketeering activity" consisting of at least two such acts within a ten-year period.  See 18 USC § 1961(5).  Even were the acts described above predicate acts, they fail to satisfy the "relationship" and "continuity" tests.  "Within the numerous sorts of relationships that can constitute a pattern, two elements must be shown:  "that the racketeering predicates are *related, and* that they amount to or pose a threat of *continued* criminal activity.'" *Brown v. Cassens Transport Co.* 546 F.3d 347, 354 (6[th]

18

Cir. 2008), *quoting H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239 (1989).  The relationship

test is satisfied if the acts "have the same or similar purposes, results, participants, victims, or

methods of commission, or otherwise interrelated by distinguishing characteristics and are not

isolated events." *H.J. Inc.,* supra at 240.  Plaintiffs' purported predicate acts fail this test.

The continuity test is both a closed- and open-ended concept, referring to either a closed

period of repeated conduct, or to past conduct that by its nature projects into the future with a

threat of repetition.  *See Brown, supra,* at 354, quoting *H.J., Inc.* at 241.  "Closed-ended

continuity can be shown "by proving a series of related predicates extending over a substantial

period of time." *Id* at 354, citing *H.J., Inc.* at 242.  Open-ended continuity may be established "if

the related predicates themselves involve a distinct threat of long-term racketeering activity,

either implicit or explicit." *Id.*  Plaintiffs have failed to allege any facts suggesting either type

continuity.    In particular, given the pendancy of Huff's criminal proceedings  (see AC

Addendum 21), there would not seem to be any likelihood whatsoever of a "distinct threat of

long-term racketeering activity" by the Huff Enterprise.

Even were the attempts to raise money for LEED deemed a Huff Enterprise[s] act, they

aren't related to any RICO predicate act alleged to have been committed by the Huff Enterprise

*against Plaintiffs*.  They would have entirely different purposes, results, and victims than the

alleged theft of business scheme.

(e)    No injury in business or property.  Plaintiffs allege they suffered damages because

the trading price of GEE shares in an extremely thin market went down from the date the LEED

13D was filed to the date they filed their Complaint.  Given the incoherence and missing parts of

their RICO claim, it's impossible to know how that circumstance remotely yields them damages

attributable to any RICO action of Movants.  Notably, they have failed to allege an act of wire or

mail fraud against themselves that has caused them damages.  And how they could have been damaged by the market price of GEE shares fluctuating, when they don't even own any GEE shares, is a mystery.

(f)      1964(a) Claim.   In ¶114 Plaintiffs allege that the "RICO Defendants collectively and individually conspired to and did derive or receive income or economic gains and opportunity from a pattern of racketeering activity some part of which was invested and used to operate their respective enterprises, enabling the Plaintiffs to be defrauded as set forth herein above."  If this is Plaintiffs' attempt to assert a claim under 18 USC §1962(a), it fails miserably. This section provides that it "shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity…  to use or invest, directly or indirectly, any part of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which, affect interstate or foreign commerce."   The Sixth Circuit has held that "in order to state a claim under Sec. 1962(a), a plaintiff must plead a specific injury to the plaintiff caused by the investment of income into the racketeering enterprise, distinct from any injuries caused by the predicate acts of racketeering."  *Vemco, Inc. v. Camardella*, 23 F.3d 129, 132 (6th Cir. 1994).  *See also Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 550 (5th Cir. 2012) ["To establish a claim under §1962(a), a plaintiff must show that its injuries resulted from the investment or use of racketeering proceeds."]  Plaintiffs have failed to allege (i) that any racketeering proceeds (ii) were invested in a RICO enterprise, and (iii) they were injured thereby.

Accordingly, Plaintiffs' have failed to state a RICO claim.

8.      **Count IX—Federal Securities Fraud**   [Jud]    Plaintiffs hoist up a hail mary in trying to articulate a fraud claim of some kind against Jud, but end up with nothing but another

air ball.  The caption to Count IX indicates violations of SEC Rule 10(b)(5)– the SEC general anti-fraud rule.  However, the only misrepresentation alleged is that relating to LEED's Form 13D discussed above, which claim has been shown to be false.  Plaintiffs' problem is that there is no private right of action under Section 13(d) of the Securities Exchange Act of 1934 for a non-shareholder in a non-tender offer context.  [See, for example, *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.* (SD NY 2001), Fed. Sec. L. Rptr. '00-'01 CCH Dec. ¶91,307.] Unfortunately for Plaintiffs, they have failed to adequately allege a 10b-5 claim against Movant either.

(a)  <u>No "material misrepresentation or omission"</u>.  As discussed above, their claim that LEED's report of its ownership of the GEE shares is false is entirely, facially bogus.

(b)  <u>"by the defendant"</u>  Long-standing U.S. Supreme Court precedent, and Plaintiffs' sole authority, the *Janus* case, amply defeat their claim against Movant.  In *Central Bank of Denver v. First Interstate Bank of Denver* 511 U.S. 164 (1994) the U.S. Supreme Court held that there is no private right of action under 10b-5 available with respect to aiding and abetting securities fraud and in *Janus Capital Group, Inc. v. First Derivative Traders,* ___ U.S. ____131 S. Ct. 2296 (2011) (also available on the Kentucky Bar Casemaker service) the U.S. Supreme Court held that only persons who "make" false statements (i.e. those with ultimate authority over a statement) are liable for securities fraud under Rule 10b-5.  The Form 13D is made by the reporting person– LEED HR, LLC.  Plaintiffs allege in ¶9 that Mr. Schroering is the organizer and manager of LEED HR, and accordingly enjoys sole authority to "make" the complained of statement.  Schroering signed and filed the LEED Form 13D.  The cases hold that persons who merely assist in creating the false statements are not liable as the "maker" of the statement.  "One

who prepares or publishes a statement on behalf of another is not its maker.ö *Janus,* Id. Accordingly, Movant is not liable for the contents of the LEED Form 13D.

(c)    No connection with õthe purchase or sale of a securityö  Plaintiffsø lack of a basis for a securities claim is indicated by the fact that, rather than actually plead it in Count IX, they simply incorporate all 126 prior paragraphs, stretching over 62 pages, and leave it at thatô shotgun pleading at its worstô  leaving Defendants and the court to wade through the mess to try to cobble together a plausible claim that needs to be responded to.  The only fraud alleged in the Amended Complaint with respect to securities involving Jud is with respect to the LEED Form 13D, which has already been shown to be accurate, was not õmadeö by Jud and didnøt involve a sale of securities.

(d)    No õrelianceö.  Plaintiffs have failed to allege any facts indicating they relied on any misrepresentation in the LEED Form 13D in connection with any securities purchase or sale.

(e)    No õeconomic loss.  Plaintiffs have failed to allege facts supporting their allegation of damages in connection with the LEED Form 13D.

(f)    No õloss causationö.  Plaintiffs have failed to allege loss causation, i.e. that the alleged misrepresentation in the Form 13D was the proximate cause of their unspecified damages.

Accordingly, Plaintiffs have failed to state a claim for federal securities fraud.


## III.  INHERENTLY FALSE ALLEGATIONS

In the initial Complaint and Amended Complaint Moody and Henderson have ***sworn*** the veracity of a host (*scores)* of allegations that are simply false, in many cases easily demonstrably false.  Many of them were dealt with in Judøs Motion to Dismiss Plaintiffsø initial Complaint.

However, Plaintiffs have chosen to double-down on their scorched earth litigation strategy and re-publish those and additional falsehoods in the mistaken belief that they enjoy immunity from defamation pursuant to the litigation privilege.  The following are some of the more egregious which bear reiteration.

1.      **Stealing Thieving Purloiners**.  Plaintiffs' scores of gratuitous allegations of "theft" and "purloining" and "fraud", including "fraudulent and false" 13D filings, have been shown to be baseless.  Moody and Henderson swear to these allegations throughout the Complaint and Amended Complaint, and as they well know, these statements are false.  Moody admitted to Movant on two separate conversations that the deal had never closed and that the Class A membership interests, which *would* have yielded control to Derby, were never issued.  Further, Derby's counsel, Bruce Miller, acknowledged in an email to Trinity on March 30 that "there has never been an effective and proper (at least in my judgment) closure of Derby's purchase of 70% of Trinity."  The Trinity/LEED transaction did nothing to impede Derby's right to insist on completing the Trinity/Derby deal with Derby becoming a 70% control member of Trinity/Delaware.  Trinity/Delaware sold its GEE stock to LEED for fair value and Derby was welcome to share in the fruits of that deal.

2.      **Derby's Upstairs Neighbor**.  Plaintiffs' claims that they were duped about Huff's background is simply incredible.  Henderson, Derby's ringleader, learned about those issues early on in the course of prospective deal discussions with a mutual acquaintance.  And in case Henderson neglected to pass that information on to his Derby colleagues, it all came spilling out in late October in connection with another deal (in fact, right in the middle of a conference call).  By then Derby was well aware of everything that was all over the internet, including the felony conviction, the SEC judgment, the Cascade judgment and Huff's alleged involvement in

the Antonucci mess (subject of a Courier-Journal article six months earlier).  They simply chose to ignore it.  The reason they chose to ignore it is amply evidenced in <u>Exhibit</u> C— they were too reliant on him.  Nonetheless they continued to deal with him on a daily basis, for almost a year, not scattering for the hills until the day he was indicted.  That involvement included thousands of meetings, texts, phone calls, and emails (a relevant example is attached as <u>Exhibit</u> D).

      3.      **Huff's alleged control of Trinity/Delaware**.  During the entire period of Plaintiffs' involvement with Trinity/Delaware, Trinity/Delaware's sole business activity was to (i) vote the GEE shares in one GEE annual meeting, and (ii) sell the GEE shares to LEED HR.  (As is evident from Trinity's  Forms 13D, Trinity was a completely passive "control" shareholder of GEE.)  Given Trinity/Delaware's complete lack of operations or business activity, it's astonishing that Plaintiffs can assert that Huff, or anyone else for that matter, controlled Trinity/Delaware's business activities— there was nothing to control.  Moreover, if Plaintiffs really believe Huff controlled Trinity/Delaware, why did they never amend their Form 13D on file with the SEC to add him to the control group disclosed in their filings?

      3.      **Schroering's invitation to the party**.   Plaintiffs complain about Schroering allegedly scheming to steal their non-existent interest in the GEE shares out from under their noses.  In fact, Schroering was introduced to Trinity/Delaware by Derby members very early in Derby's involvement because Derby knew Schroering had significant assets so they tried to induce him into investing in Derby Job so they could use *his* money to satisfy *their* payment obligations in a possible purchase.   It appears Derby spent much of their GEE related efforts on trying to generate finder fees and finding a co-investor who would fund their current and delayed purchase price obligations or buy out most of their interest (before they even owned it) so they could get their money off the table, earn a profit, and keep some upside.   See <u>Exhibits</u> A and B.

4. **Phantom Pledge**.  Plaintiffs falsely allege the GEE shares were pledged to KS Bank to collateralize a loan.  Were that the case, the shares would have been subject to a control agreement, or the shares certificate(s) would have been in the hands of KS Bank or some third party, and Trinity/Delaware would not have been able to transfer them to LEED.  Moreover, if Plaintiffs really believed the GEE shares were subject to a pledge, why didnøt they make this required disclosure in their Form 13D?

5. **Mystery Man Mike Traina**.  While irrelevant to the case, one (of a plethora) of Plaintiffsø breathless sworn õnew factsö illustrates their complete disregard and/or ignorance of the meaning of a verified complaint.  In footnote 11 Plaintiffs swear Jud has a relationship with Traina that goes õback decades.ö  The most meaningful relationship Jud has ever had with Mike Traina is when he spent a couple weeks last fall suing Trainaøs company on behalf of Huff.  Jud wouldnøt know Mike Traina if the Derby members dropped him in his lap.

6. **Fatal Flaw.**  Plaintiffs complain mightily about Movants having helped LEED steal something from them that they never even owned, without ever articulating **_why_** Movants might want to do such a thing.  The answer is simple.  It became very clear that Derby, as discussed above, did not have what it would takeô resources, resourcefulness, capital, contacts, you name itô to enhance GEEøs share value to satisfy a large debt Trinity/Delaware had looming within a year, or to satisfy Derbyøs own $1,260,000 deferred payment obligation to Trinity/ Delaware owed around the same time.

Within days of entering the January LOI Derby had gone behind Trinityøs counseløs back and attempted to pledge Trinityøs _entire_ GEE share holdingsô with an indicated value of at least $2.0 million, to KS Bank for a paltry $250,000 loan to _Plaintiffs_, only $212,000 of which found its way to Trinity.  Trinity was understandably alarmed that Derbyøs KS Bank guarantors, touted

to have "a combined net worth in excess of $15,000,000 and liquidity in excess of $6,000,000", (i) had to use Trinity's assets to bootstrap their modest purchase price, (ii) would almost destroy Trinity's borrowing power by attempting to tie up 100% of its assets for a meager $250,000, (iii) duped Mr. Simmons into signing documents that made Trinity a *co-obligor* on a *Derb*y loan, and (iv) were apparently planning on borrowing against the GEE shares to fund *other unrelated* Derby deals.  As time went by it became apparent that Derby had no money, was incapable of contributing to an "exponential" growth of GEE and GEE's share value (see Exhibit C), and was more interested in striking a quick deal to recoup their modest investment, plus a profit, while retaining some upside potential.  (See Exhibits A and B)  (In fact, Derby's funding Request to KS Bank included a pending deal status memo in which Derby claimed a high likelihood of reaping millions of dollars in fees and $100,000,000+ in equity returns from a host of deals which were given a 70-95% chance of being effectuated.  Upon information and belief, those deals yielded Derby *zero* dollars.)

While Plaintiffs seek to blame Jud for the Old Contract never being consummated (while inexplicably simultaneously arguing that they actually owned the 70% interest, and the assets underlying it were stolen from them), it appears they may have been more interested in getting out of the deal, or reconfiguring it.  Plaintiffs assert in the KS Bank Request that the "Derby team consists of strong dealmakers."  No "dealmaker" lets a deal they actually want to close slide for four days, let alone four months, unconsummated.

In September Derby had a choice to make.  It could go ahead and close the deal it had in hand, become a 70% owner of Trinity/Delaware, continue to try to enhance GEE share value by finding deals for GEE and enjoy some of the Trinity/Delaware GEE share earnout from LEED, or take the safe path, take their modest investment off the table at a 100%+ profit, and move on.

They chose the latter, for the obvious reason they had no greater faith in their abilities to do as they promised than did Trinity/Delaware.

## V.  <u>CONCLUSION</u>

Plaintiffs, well on their way to fulfilling the promise in their õExecutive Summaryö to provide the Court with õcountless documentsö to support their claims, nonetheless fail in the 600 pages of pleadings generated thus far to adequately allege a single claim, other than a breach of contract claim against a single defendant in Count II.

For the reasons set forth in Sections II-III above (and specifically excluding the information in Section IV), Movants request the Court to dismiss Plaintiffsøclaims against Movants with prejudice for failure to state a claim, other than the breach of contract claim against Trinity/Delaware alleged in Count II.  A form of proposed order is attached.

/s/ Judson B. Wagenseller
Judson B. Wagenseller
11921 Brinley Ave., Suite 203
Louisville, KY  40243
(502) 410-6905
Fax (502) 410-6902
*Judwag@insightbb.com*

March 15,  2013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2013 I filed electronically Defendantsø Motion to Dismiss through the ECF system, which sent notice of electronic filing to

J. Bruce Miller
Norma C. Miller
J. BRUCE MILLER LAW GROUP
Waterfront Plaza, 20th
325 W. Main Street
Louisville, KY  40202
*Counsel for Plaintiffs*

Joshua Rose
Hummel Coan Miller Sage & Rose LLC
239 South Fifth Street, Suite 1700
Louisville, Kentucky  40202-3268
*Counsel for Defendants Michael Schroering and LEED HR, LLC*

William J. Hunter, Jr.
Stoll Keenon Ogden PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky 40202
*Counsel for General Employment Enterprises, Inc.*

I hereby certify that on March 15, 2013 I sent via U.S. Mail a copy of the foregoing Motion to Dismiss to:

Securities & Exchange Commission
100 F. Street N.E.
Washington, D.C.  20549

/s/ Judson B. Wagenseller
Judson B. Wagenseller